IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| OSCAR J. BROWNFIELD, | ) | |
| | ) | No. 30994-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF YAKIMA, a Municipal | ) | UNPUBLISHED OPINION |
| Corporation, | ) | |
| | ) | |
| Respondent. | ) | |

FEARING, J. — The city of Yakima terminated Officer Oscar "Jeff" Brownfield from employment on April 10, 2007. In response, Brownfield complained he was wrongfully discharged and filed suit in federal court raising both state and federal claims. The federal court granted summary judgment on the federal claims and declined to exercise supplemental jurisdiction over the state law claims, dismissing those without prejudice. Brownfield refiled his state law claims in state court. The superior court granted summary judgment. We affirm. Although the claims asserted in state court are different from those asserted in federal court, issues resolved in federal court are

determinative of some of the state claims, under the collateral estoppel doctrine. Other claims must be dismissed on their merits.

## FACTS

Jeff Brownfield began employment with the Yakima Police Department in November 1999. He gained decorations for his service. In December 2000, Brownfield sustained injuries in an off duty rollover accident. Richard Drew, PhD, who provided neuropsychological treatment for the injuries, diagnosed a closed head injury, and post concussion syndrome. Based upon a January 2001 evaluation, Dr. Drew also opined that Brownfield suffered from anxiety, frustration, impatience, and impulsivity due to the closed head injury. In July 2001, Dr. Drew further concluded that Brownfield experienced "reduced self-awareness," and Drew recommended that the police department monitor Brownfield's work performance when he returned to work.

Officer Jeff Brownfield returned to light duty, at the Yakima Police Department, on March 1, 2001, and unrestricted duty on July 6, 2001. In 2003, he was transferred to the Community Services Division of the department. In this division, Brownfield created, and served as administrator of the Yakima Police Athletic League (YPAL), an independent, nonprofit corporation managed by Yakima police officers as a crime prevention program. YPAL receives government funding to provide alternative recreational, educational, and athletic activities for Yakima's youth. The organization

operates a recreational center. Through 2004, Officer Brownfield received high performance evaluations.

Jeff Brownfield continued to receive limited treatment for his head injury, primarily in the form of anti-depressants. In January 2004, Brownfield reported to Dr. Drew significant difficulty interacting with others at work and at home, and difficulty accomplishing tasks. Brownfield reported, "he was so frustrated he experienced some anger reactions he had never felt before." Clerk's Papers (CP) at 80. Brownfield added, "I'm a space cadet, I forget appointments, I'm tired, can't focus." CP at 50. He spoke of a "violence tendency," including having pulled his wife's hair on one occasion. *Id.* at 50. Dr. Drew attributed the symptoms and conduct to Brownfield's 2000 head injury. In a deposition, Brownfield denied reporting any work difficulties to Dr. Drew, but admitted to reporting difficulties at home.

Jeff Brownfield's purported whistleblowing centered around complaints about Officer Joe Dejournette and Lieutenant Mike Merryman. Brownfield served with Dejournette in the Community Services Division and at YPAL. Merryman was a supervisor of both Brownfield and Dejournette.

On June 17, Officer Brownfield sent his direct supervisor, Sergeant Mike Amos, a memorandum entitled, "Unethical work practices." CP at 82-83. Brownfield objected to Dejournette's failure to fulfill his Drug Abuse Resistance Education (DARE) duties and to another supervisor's, Lieutenant Mike Merryman's, excusing of Dejournette's conduct.

Brownfield also complained that Merryman gave Dejournette compensatory time for his work with YPAL, while Brownfield and another officer received no compensation for the same work. In the memorandum, Brownfield wrote that "Dejournette and Lt. Merryman are long time friends and on the surface this is a true conflict of interest." CP at 83. Yakima Police Department Captain Greg Copeland later investigated Brownfield's allegations and found them to be based upon Brownfield's perceptions, not on fact.

On August 15, Officer Brownfield sent a memo to Sergeant Tim Bardwell, in the Yakima Police Department Fraud Division. Brownfield sought Bardwell's help in removing Officer Dejournette from fraud cases so that Dejournette could devote full time to his duties as a community services officer. Brownfield complained that Dejournette used fraud cases as an excuse to avoid his community service duties, which imposed extra work on Brownfield.

In early 2005, Jeff Brownfield again complained about Officer Dejournette to Sergeant Mike Amos and Lieutenant Mike Merryman. Brownfield claimed that Dejournette failed in his duties as YPAL treasurer. According to Brownfield, Dejournette did not timely reimburse the YPAL bank account, which resulted in an overdraft being charged for an insufficient check. Brownfield alleged that Officer Dejournette put YPAL's grant eligibility in jeopardy by not timely renewing YPAL's charter with the national Police Athletic League (PAL). To ensure that YPAL functioned effectively, Brownfield assumed some of Officer Dejournette's treasurer duties.

4

Brownfield also relayed to supervisors several citizen complaints regarding Officer Dejournette's lazy and unreliable work with YPAL.

On May 4, Jeff Brownfield sent an e-mail message to Yakima Police Chief Sam Granato. In this e-mail, Brownfield complained about Lieutenant Merryman retaliating against him for complaining about Officer Dejournette. Brownfield believed that Merryman exaggerated the significance of a scheduling error by YPAL at a city Cinco de Mayo activity. Two days later, Mike Merryman verbally reprimanded Officers Brownfield and Dejournette for the error. Merryman confirmed the reprimand with a memo to Sergeant Amos.

Jeff Brownfield, because of illness, did not work on May 9, which left Joe Dejournette in charge of the YPAL center. Officer Dejournette closed the center early, despite scheduled activities and without consulting Brownfield. On May 10, Brownfield spoke to police Sergeants Bob Hester and Mike Amos regarding Officer Dejournette's early closing of the center. Brownfield also complained to the sergeants that Lieutenant Merryman was conducting a surreptitious investigation of him and wrongfully talking about his (Brownfield's) health to other officers. Brownfield asked Sergeant Hester to transfer him to patrol duties so that he could avoid supervision by Merryman.

Also on May 10, Jeff Brownfield sent an e-mail message to police members of the YPAL board regarding Officer Joe Dejournette's premature closing of the YPAL center and his refusal to conduct other community service activities. The board members were

Joe Dejournette, Lieutenant Mike Merryman, Sergeant Mike Amos, Officers Ben Hittle and Rey Garza, and Chief Sam Granato.

At 5:10 p.m., on May 10, Lieutenant Merryman sent Officer Brownfield an e-mail message, directing Brownfield to appear at a meeting at 9:00 the next morning. Brownfield missed the meeting because he did not check his e-mail until May 13. Jeff Brownfield arrived at work at 10 a.m., on May 11. Thereafter his immediate supervisor, Sergeant Mike Amos, directed him to the Police Chief's conference room in order "to fix this s . . . t right now." CP at 107. Brownfield expected Chief Sam Granato to be present at the conference room. In his brief, Brownfield writes that Sergeant Amos promised to arrange a meeting with the Chief, but the record does not support this statement. Lieutenant Mike Merryman was present instead.

During the May 11 morning conference, Lieutenant Merryman and Sergeant Amos wished to discuss Officer Brownfield's e-mails, Officer Dejournette's YPAL center closure, and the scheduling incident. According to Brownfield, Amos and Merryman made excuses for Dejournette. Brownfield explained that Officer Dejournette's poor performance had a long history. Brownfield grew concerned about the nature and progress of the meeting and believed that Merryman might be continuing an investigation against him as a result of his whistleblowing. Brownfield asked for a recess of the meeting to obtain union representation and prepared to leave the conference room. Merryman ordered Jeff Brownfield to sit back down, but Brownfield refused.

6

Merryman told Brownfield that he was not conducting an internal investigation and again ordered Brownfield to sit. Brownfield exited the room instead.

After leaving the chief's conference room on May 11, Jeff Brownfield spoke to Officer Rich Fowler, his union representative. Fowler, in turn, spoke to Lieutenant Merryman who said he was willing to finish his conversation with Brownfield with Fowler present. While Fowler attempted to convince Brownfield to return to the meeting, Sergeant Amos approached and instructed Brownfield to return to the meeting. Brownfield responded to Amos, "you f . . . ked me . . . . "[G]et out of here, get the f . . . k out of here." CP at 122. Brownfield believed Amos had tricked Brownfield into a meeting with the "mouth of the beast"—Mike Merryman. CP at 122.

On May 11, Lieutenant Mike Merryman suspended Jeff Brownfield for insubordination. The Yakima Police Department also began an internal investigation into Brownfield's conduct. The completed investigation found Brownfield to be guilty of insubordination and verbal abuse of a superior officer. On July 28, Brownfield received the punishment of the loss of 24 hours of accrued paid leave.

Jeff Brownfield complains that the Yakima Police Department ignored his whistleblower complaints. Nevertheless, in May Captain Greg Copeland, at the direction of Chief Sam Granato, investigated Brownfield's allegations of poor performance of Joe Dejournette, of Dejournette's manipulating overtime pay, of Dejournette's failure to keep YPAL books, and of Mike Merryman's affording Dejounette favorable treatment.

7

Copeland reviewed Officer Dejournette's overtime and comp time records. He also took statements from Brownfield, Merryman, Mike Amos, and two YPAL employees, Officer Rey Garza and civilian Crystal Dodge.

On May 15, Captain Copeland prepared a six-page report, including an appendage documenting overtime paid to Joe Dejournette and Jeff Brownfield. The report detailed his findings in response to Brownfield's allegations. Copeland found no illegal conduct. He found no evidence of favoritism, but agreed that Officer Dejournette suffered from "poor time management skills," which resulted in deficient performance in both the police department's Fraud Division and the Community Services Division. CP at 156. Copeland also concluded that Dejournette failed in his YPAL bookkeeping duties, in part due to the department's failure to provide training. Copeland recommended an audit of the YPAL bank account records.

In June, the Yakima Police Department transferred Jeff Brownfield to its patrol division. In September 2005, a series of incidents led the police department to question Brownfield's fitness for duty.

The first incident occurred during roll call and entailed a verbal altercation between Jeff Brownfield and Officer Illeana Salinas over the latter's job performance and her frequent use of the obscenity "f . . . k." In turn, Officer Salinas accused Brownfield of physical intimidation. The altercation sparked an internal investigation into the

8

conduct of both officers, which investigation upset Brownfield. The Department chose not to discipline either officer.

A second incident occurred during the internal investigation of the verbal altercation between Officers Brownfield and Salinas. Captain Greg Copeland encouraged Jeff Brownfield to seek professional counseling for stress. Brownfield refused to discuss his mental health with Copeland. Union representative Rich Fowler later also suggested to Brownfield that he seek counseling. Brownfield exploded at Fowler.

The final incident transpired in late August. Officer Jeff Brownfield stopped a car because it matched the description of a vehicle used by a felony suspect. The suspect was not in the car, but the driver of the car and onlookers heckled and threatened Brownfield. Brownfield was shaken and called dispatch for assistance. Sergeant Chad Stephens arrived to help. Brownfield and an adult male exchanged more physical threats. At the end of the confrontation, Brownfield's arms and legs noticeably shook and onlookers ridiculed Brownfield. One onlooker angrily suggested to Stephens that he place Brownfield on medications.

On September 28, a co-worker of Jeff Brownfield reported to the Yakima Police Department administration that Brownfield occasionally expressed feelings of "hopeless[ness]." CP at 160. Brownfield was then engaged in divorce proceedings. Both he and his wife had called law enforcement multiple times complaining of the

other's behavior. On September 19, Brownfield filed a petition for a restraining order against his wife. In the petition, Brownfield stated, "[b]ecause of a severe head injury due to an auto accident, I suffer from emotional impulsivity." CP at 139.

The Yakima Police Department referred Jeff Brownfield to psychiatrist Kathleen P. Decker, for a fitness for duty examination. Decker evaluated Brownfield on October 19, and issued a report two months later. She found Brownfield unfit for duty primarily due to an Axis I diagnosis of "[m]ood [d]isorder due to a [g]eneral [m]edical [c]ondition with mixed features." CP at 184. Axis I is the top level of the DSM multiaxial comprehensive assessment and denotes acute symptoms needing treatment. Dr. Decker believed that Brownfield's impairment was permanent because "these [PSYCHIATRIC] symptoms are now likely . . . fixed" this many years after the 2000 car accident. CP at 185. Decker elaborated that medication might stabilize Brownfield's emotional volatility, but would not fix "the type of [judgment] difficulties [he] displays." CP at 185. She opined that "there is no reasonable accommodation that can be made." CP at 186.

As part of her assessment, Kathleen Decker referred Jeff Brownfield to forensic neurologist, G. A. DeAndrea. Dr. DeAndrea's examination of Brownfield confirmed a neurological impairment consistent with his psychological symptoms.

Jeff Brownfield suffered additional injuries in a second car accident. Dr. Roy Gondo treated Brownfield's physical injuries from this collision and cleared him to return

to work on February 3, 2006. Gondo, however, is not a mental health professional, and he did not evaluate or treat Brownfield's psychological condition. When the city of Yakima asked Dr. Gondo his opinion of Brownfield's psychological condition, he opined that Brownfield was psychologically fit for duty.

Jeff Brownfield underwent another fitness for duty evaluation with Norman Mar, a psychologist chosen by his union. In August, Mar confirmed all symptoms found by psychiatrist Kathleen Decker. Dr. Mar, however, believed the symptoms were "more likely the result of personality characteristics and emotional issues than of Officer Brownfield's head trauma from 2000." CP at 203. Mar agreed that Brownfield was currently unfit for duty, but disagreed with Dr. Decker's finding that Jeff Brownfield would not improve with treatment. Dr. Mar opined that Brownfield could return to full duties within about three months of intensive counseling or psychotherapy from a mental health counselor.

The city of Yakima provided Dr. Kathleen Decker with Dr. Norman Mar's report, and requested an updated opinion from Decker, on Jeff Brownfield's fitness for duty. In response, Dr. Decker stated, "[t]he answer to this question remains that Officer Brownfield is Unfit for Duty as an armed patrol officer." CP at 188. She reaffirmed her initial opinion of "likely" permanence considering that Mar saw Brownfield exhibit the same symptoms of lack of emotional control and impaired judgment nearly a year after Decker's initial examination and report. Decker opined that Brownfield is fit for civilian

11

occupations, but not the "life and death decisions" required of law enforcement officers. CP at 189. She added, "[T]he Department might offer him an unarmed position where he might continue to contribute to law enforcement, if such is available." CP at 190.

Following the report from Kathleen Decker and Norman Mar, Jeff Brownfield underwent counseling, from September 2006 to January 2007, with Robert Newell, PhD. Dr. Newell declined assessing Brownfield's fitness for duty. Brownfield asked Dr. Mar to review Dr. Newell's treatment notes and issue an updated opinion. Mar opined that Brownfield remained unfit for duty, but believed that Brownfield would, at an indeterminate time, be fit for duty if he continued counseling with Newell and increased the frequency of visits from three times every two weeks to twice a week.

The city of Yakima directed Jeff Brownfield to undergo another fitness for duty evaluation with Dr. William Ekemo on February 15, 2007. In response, Brownfield wrote an e-mail to City Manager Dick Zais, informing him that he revoked permission to share his medical records with others, and he intended to sue Dr. Kathleen Decker for Health Insurance Portability and Accountability Act (HIPAA) violations. Brownfield demanded that the Ekemo examination be recorded. He copied police administrators with the e-mail message.

Jeff Brownfield underwent a third fitness for duty evaluation on February 15 by Dr. Ekemo. The city of Yakima and Dr. Ekemo originally intended Ekemo's examination to be a neuropsychological supplement to Dr. Decker's examination.

12

Because Brownfield sent Dr. Decker notice that he intended to sue her for malpractice and HIPAA violations, city of Yakima asked Dr. Ekemo to perform a complete evaluation. Dr. Ekemo could not complete the entire examination on February 15, and so scheduled a return appointment for March 6. Brownfield refused to attend the second day despite orders to do so. When Brownfield's attorney notified Dr. Ekemo that Brownfield would not attend, Yakima City Manager Dick Zais wrote a letter to Jeff Brownfield, which concluded:

> Mr. Brownfield, you have been previously ordered to submit to Dr. Ekemo's evaluation and cooperate with the evaluation process. The purpose of this letter is to re-iterate that order. **You are hereby ordered to appear on March 6, 2007, for the continuation of Dr. Ekemo's fitness for duty evaluation and cooperate fully with the evaluation process. If you fail to follow this order, you will be considered insubordinate and the likely penalty of insubordination is termination of employment.** Moreover, if you fail to complete the examination process with Dr. Ekemo, the City will make a determination regarding your fitness for duty based on the medical information to date.

CP at 151.

When Jeff Brownfield failed to show for the second day of his examination by William Ekemo, city of Yakima reinitiated termination of employment proceedings. On March 19, Brownfield participated in a pretermination hearing with City Manager Dick Zais. Following this meeting, Zais fired Brownfield for insubordination. City of Yakima's termination letter identified established policies and procedures that Brownfield violated by refusing to complete the duty evaluation. Brownfield violated the

13

city of Yakima Police Department Policies and Procedures, the union's Collective

Bargaining Agreement, and the Police Service Commission Rules and Regulations.

On January 8, 2008, Jeff Brownfield filed suit against the city of Yakima in United

States District Court, for the Eastern District of Washington. *See Brownfield v. City of*

*Yakima*, 612 F.3d 1140, 1144 (9th Cir. 2010). Brownfield alleged five causes of action:

> retaliation for reporting a fellow officer's unlawful conduct, which
> retaliation violated Brownfield's first amendment rights and the
> Washington Law Against Discrimination (WLAD) RCW 49.60;
>
> retaliation for whistleblowing activities in violation of the WLAD;
>
> violations of Titles I and V of the Americans with Disabilities Act (ADA);
> and
>
> violations of the Family Medical Leave Act (FMLA) and HIPAA; and
>
> negligent hiring, retention, supervision, and training of Police Chief
> Granato in violation of 42 U.S.C. § 1983.

*See* CP at 438. On June 4, 2009, United States District Court Judge Robert H. Whaley

granted summary judgment in favor of the city of Yakima.

In his summary judgment ruling, Judge Whaley first addressed Jeff Brownfield's

ADA claim. He ruled that the city of Yakima met the ADA's "business necessity"

exception that allowed it to subject Brownfield to a fitness for duty examination "and that

[city of Yakima] had a valid non-discriminatory reason (insubordination) for firing

[Brownfield]." CP at 438. The judge applied the "business necessity" exception because

"[t]he undisputed facts establish[ed] that [Brownfield] demonstrated a pattern of highly

14

emotional responses to a number of situations he encountered during the course of employment between May 2005 and September 28, 2005." CP at 439-40. "On this record, no reasonable jury could find that [Yakima] did not have a substantial and legitimate objective basis to question whether [Mr. Brownfield] was emotionally stable enough to interact safely with the public and fellow officers. . . ." CP at 440.

Judge Robert Whaley also dismissed Jeff Brownfield's claim alleging retaliation for engaging in ADA protected activity by asserting his alleged right under the ADA to not submit to an unlawful fitness for duty examination (FFDE). The judge dismissed this claim because, as a matter of law, the order to finish the exam with Dr. Ekemo was lawful.

Judge Robert Whaley addressed the merits of Jeff Brownfield's United States Constitution First Amendment cause of action. To maintain this claim, Brownfield needed to demonstrate, among other factors, that the city of Yakima fired him for commenting on a matter of public interest (quoting *Eng v. Cooley*, 552 F.3d 1062 1070 (9th Cir. 2009). Judge Whaley dismissed this cause of action because Brownfield's complaints of unfair workload, favoritism, and his partner's sloppiness "are the stuff of a personal dispute, not of vital interest to citizens." CP at 442.

Assuming that Jeff Brownfield could establish that he commented on a matter of public concern, Judge Whaley ruled that the first amendment cause of action still failed on the merits because he could not establish causation. "[City of Yakima] had two

legitimate reasons for termination: unfitness for duty and insubordination." CP at 444.

Judge Whaley ruled:

[N]o reasonable jury could find that an adverse employment action resulted from

anything other than Plaintiff's unfitness for duty and his insubordination.

CP at 442.

Judge Whaley dismissed Jeff Brownfield's HIPAA claim because Brownfield

abandoned it. The United States District Court Judge Whaley ruled that the FMLA claim

failed because it was premised on proof that Dr. Gondo's work release also took into

consideration Brownfield's psychological condition. Because Dr. Gondo only evaluated

Brownfield's physical condition, Yakima had no duty to return him to work when he

needed clearance by a mental health professional.

Finally, Judge Whaley dismissed the WLAD and negligence claims without

prejudice. Because no federal claims remained, the judge declined to exercise

supplemental jurisdiction over these two state law claims.

Jeff Brownfield appealed the United States District Court's summary judgment

order to the Ninth Circuit. *See generally Brownfield v. City of Yakima*, 612 F.3d 1140

(9th Cir. 2010). The Ninth Circuit's published decision affirmed every aspect of the

summary judgment order. *Id.*

While his appeal of the federal claims was pending, Jeff Brownfield filed this suit

in Yakima County Superior Court. His complaint alleges four causes of action: (1)

violation of RCW 42.41.040 (whistleblower retaliation), (2) wrongful discharge in violation of public policy, (3) negligent hiring, supervision, and retention of Chief Samuel Granato, and (4) violation of the WLAD, RCW 49.60.180.

The trial court granted the city of Yakima's summary judgment motion. The lower court ruled that the city of Yakima was exempt from a whistleblower suit under RCW 42.41.050, since the city of Yakima had its own whistleblower policy. The trial court dismissed the wrongful discharge claim, because Brownfield could not meet the jeopardy element, and collateral estoppel barred relitigation of the causation element of the tort. The court dismissed the WLAD action, because no rational trier of fact could find that the stated reason of insubordination was pretextual. Finally, the trial court dismissed the negligent hiring, supervision, and retention claims, because Brownfield failed to establish a causal relationship between Chief Granato's hiring and retention and the harm that Brownfield suffered.

## ANALYSIS

Issue I: Did the trial court err when granting summary judgment dismissing Jeff Brownfield's statutory whistleblower claim, when the city of Yakima published its own whistleblower policy? No.

The Washington legislature adopted the Local Government Whistleblower Protection Act (Act) in 1992, chapter 42.41 RCW. The Act provides protections and remedies for one defined as a "whistleblower." RCW 42.41.010-.040. We question

17

whether the complaints forwarded by Jeff Brownfield qualify him for "whistleblower"

status. *See* RCW 42.41.010(1)'s definition of "improper governmental actions." We

need not address this question or the question whether a whistleblower may sue in

superior court, rather than follow the procedures outlined in RCW 42.41.040. We agree

with the trial court that the city of Yakima is exempt from chapter 42.41 RCW.

RCW 42.41.050 reads:

Any local government that has adopted or adopts a program for reporting
alleged improper governmental actions and adjudicating retaliation
resulting from such reporting shall be exempt from this chapter if the
program meets the intent of this chapter.

The city of Yakima maintained a whistleblower policy in its employee handbook.

Jeff Brownfield argues, in support of the summary judgment motion, that the city of

Yakima provided to the court its 2009 employee handbook, adopted two years after

Brownfield's firing. Presumably Brownfield wants this court to withhold the statutory

exemption because of the city's purported failure to present the relevant policy in support

of its motion. The record, however, shows that the city of Yakima filed both the 2009

handbook and the 2000 handbook, the previous version, in support of its motion.

Brownfield has not argued that the city of Yakima's whistleblower program created by its

policy failed to meet the intent of chapter 42.41 RCW.

Jeff Brownfield now argues on appeal that the city of Yakima violated its own

whistleblower policy. Nevertheless, Brownfield did not plead, in his complaint, that the

18

city of Yakima violated the city's policy. Brownfield cannot present a theory for relief that he failed to plead in his complaint as required by CR 8. *Dewey v. Tacoma School Dist. No. 10*, 95 Wn. App. 18, 26, 974 P.2d 847 (1999); *Shields v. Morgan Financial, Inc.*, 130 Wn. App. 750, 758, 125 P.3d 164 (2005). Accordingly, the trial court did not err by granting summary judgment for the city on the issue of whistleblower liability.

Issue II: Did the trial court err when granting summary judgment dismissing Jeff Brownfield's wrongful discharge in violation of public policy claim, when the federal court previously ruled that the city of Yakima terminated Brownfield's employment because of insubordination and unfitness for duty, not for whistleblowing? No.

The Washington State Supreme Court recognized the tort of wrongful discharge in violation of public policy in *Thompson v. St. Regis Paper Company*, 102 Wn.2d 219, 685 P.2d 1081 (1984). The Supreme Court later defined the tort's elements:

> The plaintiffs must prove the existence of a clear public policy (the clarity element).
> The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy (the jeopardy element).
> The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the causation element).
> The defendant must not be able to offer an overriding justification for the dismissal (the absence of justification element).

*Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996) (citations omitted).

We question whether Jeff Brownfield's version of the facts supports any of the four elements of the tort of wrongful discharge in violation of public policy. We focus only on the third element—causation.

Several rulings of United States District Court Judge Robert Whaley bind Jeff Brownfield and preclude a judge or jury in this suit from finding that Jeff Brownfield's purported whistleblowing caused his termination from employment. Judge Whaley determined that Brownfield was not terminated for exercising his free speech rights. In other words, the city of Yakima did not fire Brownfield for speaking about Officer Joe Dejournette's shortcomings, Lieutenant Mike Merryman's favoritism toward Brownfield, or any improper accounting for funds at YPAL. Judge Whaley also ruled that: "[N]o reasonable jury could find that an adverse employment action [the firing of Brownfield] *resulted* from anything other than Plaintiff's unfitness for duty and his insubordination." CP at 442. (Emphasis added). Jeff Brownfield cannot avoid these facts because of the doctrine of collateral estoppel.

The doctrine of collateral estoppel encompasses issue preclusion. *Shoemaker v. City of Bremerton,* 109 Wn.2d 504, 507, 745 P.2d 858 (1987). Collateral estoppel bars relitigation of any issue that was actually litigated in a prior lawsuit. *Hanson v. City of Snohomish,* 121 Wn.2d 552, 561, 852 P.2d 295 (1993); *Pederson v. Potter,* 103 Wn. App. 62, 69, 11 P.3d 833 (2000); Philip A. Trautman, *Claim and Issue Preclusion in Civil Litigation in Washington,* 60 WASH. L. REV. 805, 812-13 (1985). One of the purposes of

20

issue preclusion is to encourage respect for judicial decisions by ensuring finality. The question is always whether the party to be estopped had a full and fair opportunity to litigate the issue. *Nielson v. Spanaway Gen. Med. Clinic, Inc.*, 135 Wn.2d 255, 262, 956 P.2d 312 (1998). That question turns on four primary considerations: (1) whether the identical issue was decided in a prior action; (2) whether the first action resulted in a final judgment on the merits; (3) whether the party against whom preclusion is asserted was a party to that action; and (4) whether application of the doctrine will work an injustice. *Hanson*, 121 Wn.2d at 562.

Judge Whaley's ruling was in the form of a summary judgment order. For collateral estoppel to apply, it is not necessary that the issue was previously determined through a trial. "[A] grant of summary judgment constitutes a final judgment on the merits and has the same preclusive effect as a full trial of the issue." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Nw Youth Servs.*, 97 Wn. App. 226, 233, 983 P.2d 1144 (1999). In *National Union*, the court of appeals ruled on a summary judgment ruling, in a suit brought by a patient against her therapist and his employer, that the therapist was acting outside the scope of his employment when he engaged in an improper sexual relationship with the patient. The court held that the patient was collaterally estopped from relitigating that issue in a later action by the employer's liability insurer for a declaration of noncoverage.

United States District Court Judge Robert Whaley only addressed Jeff Brownfield's federal claims. Nevertheless, collateral estoppel applies even though the ultimate issues are different in the two suits. *Island County v. Mackie*, 36 Wn. App. 385, 391-92, 675 P.2d 607 (1984). State courts also apply collateral estoppel to rulings rendered in federal courts. *Gannon v. Am. Home Prod., Inc.*, 211 N.J. 454, 48 A.3d 1094, 1100 (2012) (prior federal judgment precluded relitigation of issue of causation in state court products liability action against manufacturer of oral polio vaccine, alleging that vaccine caused cancer in plaintiff); *Lumpkin v. Jordan*, 49 Cal. App. 4th 1223, 1231-32, 57 Cal. Rptr. 2d 303 (1996) (despite substantive differences between federal and state antidiscrimination laws, collateral estoppel applies to federal court's determination that plaintiff was discharged for nondiscriminatory reasons); *see also Indiana Dep't of Envtl. Mgmt. v. Conard*, 614 N.E.2d 916, 923 (1993); *Jerome J. Steiker Co., Inc. v. Eccelston Properties Ltd.*, 156 Misc. 2d 308, 313, 593 N.Y.S.2d 394 (1992); *Copper State Thrift & Loan v. Bruno*, 735 P.2d 387, 390 (1987); *Levy v. Cohen*, 19 Cal. 3d 165, 137 Cal. Rptr. 162, 166, 561 P.2d 252 (1977).

The application of collateral estoppel does not work an injustice on Officer Brownfield. Factors recognized under this fourth prong of collateral estoppel include: whether the first judgment was appealable, whether there have been factual changes since the first proceeding, and whether the first determination was manifestly erroneous. Trautman, *supra*, at 805, 841-42. The judgment in the federal case was appealable. In

22

fact, it was affirmed on appeal. *See Brownfield*, 612 F.3d 1140. The record contains no indication that any factual changes have occurred since the first proceeding. The first decision was not manifestly erroneous.

In support of his wrongful discharge claim and other claims, Jeff Brownfield complains that the city of Yakima ordered him to a "fourth" FFDE before Dr. William Ekemo. We question whether the additional visit to Dr. Ekemo can be considered a "fourth" evaluation. More importantly, we are bound to conclude that the demand to return to Dr. Ekemo was a legitimate demand. In the United States District Court suit, Judge Whaley ruled as a matter of law that the direction to return to Ekemo was a valid demand. For the same reasons that collateral estoppel applies to Judge Whaley's ruling that insubordination was the reason for the termination from employment, Brownfield is barred from contending the direction to return to Dr. Ekemo to complete the evaluation was wrongful.

Issue III: Did the trial court err when granting summary judgment on Jeff Brownfield's claim he was terminated from employment because of a disability, when Brownfield fails to provide any evidence or argument that the city of Yakima's firing him for insubordination was a pretext? No.

In his complaint, Jeff Brownfield alleges two forms of disability discrimination: termination from employment and a failure to accommodate. The two forms are discrete

claims. *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 27-8, 244 P.3d 438 (2010). We will address the claims separately.

The trial court correctly refused to apply collateral estoppel from Judge Whaley's rulings regarding Brownfield's ADA claim to his WLAD claim. The ADA requires a plaintiff to prove, "but for" the illicit motive of a disability, he would not have been fired. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010). The WLAD imposes a less strict standard of causation upon the plaintiff—a "substantial factor" test. *Fell v. Spokane Transit Auth.*, 128 Wn.2d 618, 637, 911 P.2d 1319 (1996); *Wash. State Commc'n Access Project v. Regal Cinemas, Inc.*, 173 Wn. App. 174, 187, *reviewed denied*, 293 P.3d 413 (2013). Thus, Jeff Brownfield could win under Washington law, but lose under federal law. Issues are not identical and collateral estoppel will not apply when the standards governing them are significantly different. *Hanson*, 121 Wn.2d 552 at 574; *Standlee v. Smith*, 83 Wn.2d 405, 518 P.2d 721 (1974); *Cullen v. Margiotta*, 811 F.2d 698, 732 (2d Cir. 1987). Thus, we address the merits of Brownfield's disability discrimination claim.[1]

---

[1] Judge Whaley ruled that no reasonable jury could find that an adverse employment action resulted *from anything other than plaintiff's unfitness for duty and his insubordination*. In other words, Judge Whaley found insubordination and unfitness for duty to be the only cause of the discharge. Disability was not even a "substantial factor" in the firing. Thus, one could conclude that collateral estoppel should bar the WLAD suit, despite the different standard of causation from an ADA claim. We have found no decision that applies collateral estoppel, however, when the legal standard

24

The WLAD makes it "an unfair practice for any employer . . . [t]o discharge or bar any person from employment because of . . . the presence of any sensory, mental, or physical disability." RCW 49.60.180. "[T]he prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved." RCW 49.60.180(1).

"An employee claiming discrimination must first prove a prima facie case of discrimination and, if he or she does so, then the burden shifts to the employer to present evidence suggesting a nondiscriminatory reason for [the termination]." *Swinford v. Russ Dunmire Oldsmobile, Inc.*, 82 Wn. App. 401, 413-14, 918 P.2d 186 (1996) (citations omitted). "If the employer sustains its burden, the employee must then demonstrate that the reasons given by the employer are pretext for discrimination." *Id.* at 414. "The elements of a prima facie case of disparate treatment disability discrimination are that the employee was: [1] disabled, [2] subject to an adverse employment action, [3] doing satisfactory work, and [4] discharged under circumstances that raise a reasonable inference of unlawful discrimination." *Callaghan v. Walla Walla Hous. Auth.*, 126 Wn. App. 812, 819-20, 110 P.3d 782 (2005).

---

differs from the first case and second case, regardless of whether a finding by the first court meets the legal standard applied in the second case.

The trial court did not consider whether Jeff Brownfield established a prima facie case of discrimination. The court instead, at the city of Yakima's invitation, focused on whether any rational trier of fact could find that the city's stated nondiscriminatory reason for termination—insubordination—was pretextual. We also focus on this question.

"A plaintiff cannot create a pretext issue without some evidence that the articulated reason for the employment decision is unworthy of belief." *Kuyper v. Dep't of Wildlife*, 79 Wn. App. 732, 738, 904 P.2d 793 (1995). "To do this, a plaintiff must show, for example, that the reason has no basis in fact, it was not really a motivating factor for the decision, it lacks a temporal connection to the decision or was not a motivating factor in employment decisions for other employees in the same circumstances." *Id.* at 738-39.

On appeal, Jeff Brownfield does not suggest that any of these pretextual factors are present, let alone contend that the firing for insubordination was pretextual. Even at the trial court, Brownfield did not argue that the firing for insubordination was pretextual. The firing of Jeff Brownfield came immediately after he refused an order from City Manager Dick Zais to complete an important and valid examination to determine his psychological fitness for duty. Brownfield provides no evidence of Zais treating anyone dissimilarly from him. City Manager Zais was removed from the complaints earlier raised by Brownfield.

26

Summary judgment principles are familiar but must be repeated. Summary judgment should be granted if the evidence establishes there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995). To succeed on a summary judgment motion, the moving party must first show the absence of an issue of material fact. *Ingersoll v. DeBartolo, Inc.*, 123 Wn.2d 649, 654, 869 P.2d 1014 (1994). The burden then shifts to the nonmoving party to set forth specific facts showing a genuine issue for trial. *Id.* at 654. The court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). On appeal of summary judgment, the standard of review is de novo and the appellate court performs the same inquiry as the trial court. *Id.* at 34. To repeat, Jeff Brownfield presents no evidence supporting a conclusion that his firing was pretextual.

Issue IV: Should we review whether Jeff Brownfield's claim for failure to accommodate a disability survives a summary judgment motion, when he presents no legal argument to support the claim in his brief? No.

In his appeal brief, Jeff Brownfield devoted only two sentences to his claim for failure to accommodate his disability. He wrote:

> If the City perceived Ofc. Brownfield as unable to function in the most stressful police work, the City owed an affirmative duty to Ofc. Brownfield to accommodate him. The City failed to satisfy this duty not only when it

27

> first took him out of a non-stressful position at which he excelled [Community Services Division], but also when it transferred him to the Patrol Unit, knowing it was a more stressful position both physically and emotionally.

Br. of Appellant at 24-25.

In support of this contention, Brownfield quoted, in a footnote, a section from the Washington Office of Financial Management Bulletin, *State Policy Guidelines on Reasonable Accommodation of Persons with Disabilities Related to State Employment.* This bulletin has no application to this appeal, since Jeff Brownfield was not a state employee. Brownfield's scant analysis of his reasonable accommodation claim is not accompanied by any law that applies to his circumstances or supports his contention. He cites no case law addressing a failure to accommodate claim.

RAP 10.3(a)(6) directs each party to supply, in his brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." We do not consider conclusory arguments that are unsupported by citation to authority. *Joy v. Dep't of Labor & Indus.*, 170 Wn. App. 614, 629, 285 P.3d 187, 194-95 (2012). Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration. *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012) (quoting *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998)). Therefore, we decline to address this assignment

of error.

A thorough analysis and citation to authority is particularly apt in this case. The law of reasonable accommodation involves an interactive process between the employer and employee.

> Generally, the best way for the employer and employee to determine a reasonable accommodation is through a flexible, interactive process. RCW 49.60.040(7)(d); *MacSuga v. Spokane County*, 97 Wn. App. 435, 443, 983 P.2d 1167 (1999). A reasonable accommodation envisions an exchange between employer and employee, where each party seeks and shares information to achieve the best match between the employee's capabilities and available positions. *See Goodman v. Boeing Co.*, 127 Wn.2d 401, 408-09, 899 P.2d 1265 (1995); RCW 49.60.040(7)(d). "[A]n impairment must be known or shown through an interactive process to exist in fact.") The employer has a duty to determine the nature and extent of the disability, but only after the employee has initiated the process by notice. *Goodman*, 127 Wn.2d at 409. In addition, the employee retains a duty to cooperate with the employer's efforts by explaining the disability and the employee's qualifications. *Id.* at 408. A good faith exchange of information between parties is required whether the employer chooses to transfer the employee to a new position or to accommodate the employee in the current position.

*Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 779-80, 249 P.3d 1044 (2011). The record provides us no indication of Jeff Brownfield identifying any disability for the city of Yakima or proposing any accommodation for the disability.

Brownfield complains about being transferred from the Community Services Division to the Patrol Division, but the record shows that he was the one who asked for the transfer, not because of any disability but because he wanted to avoid "the mouth of the beast"—Lieutenant Mike Merryman. CP at 97. If we were to address Brownfield's

29

appeal of dismissal of the reasonable accommodation claim, we would desire analysis as to whether an employer can be faulted for granting a transfer requested by the employee.

Issue V: Did the trial court err by granting summary judgment on the negligent hiring and supervision claim, when the city of Yakima did not claim the actions of City Manager Dick Zais or Police Chief Sam Granato were outside the scope of their respective authority? No.

In his complaint, Jeff Brownfield alleges that Yakima negligently hired, supervised and retained Police Chief Granato. On appeal, Brownfield twice denies that his negligence allegation targeted Chief Granato, and instead declares that he actually alleged city of Yakima negligently hired, supervised and retained its City Manager, Dick Zais. Br. of Appellant at 26; Reply Br. of Appellant at 22. Brownfield cannot present a theory for relief that he failed to set forth in his complaint as required by CR 8. *Dewey at 26* ; *Shields at 758.* Accordingly, this issue does not merit review.

Regardless of whether Brownfield aims his negligence theory at the hiring and employing of Granato or Zais, the theory fails as a matter of law. The purpose behind a negligent hiring and supervision action is to prevent an employer from avoiding liability for the misconduct of an employee committed outside the scope of employment, when the employer should not have hired or maintained the employee because of his or her tendencies. *S.H.C. v. Sheng-Yen Lu,* 113 Wn. App. 511, 517, 54 P.3d 174 (2002). Thus, to bring the cause of action, the employee who caused the harm must have acted outside

30

his scope of employment. *LaPlant v. Snohomish County*, 162 Wn. App. 476, 480-81, 271 P.3d 254 (2011). The city of Yakima adopted, as its own, all of the actions taken by Chief Granato and City Manager Zais, about which Jeff Brownfield complains. When the employer does not disclaim liability for the employee, the claim collapses into a direct tort claim against the employer, which requires dismissal of the negligent supervision claim. *Niece v. Elmview Group Home*, 131 Wn.2d 39, 48-51, 929 P.2d 420 (1997).

## CONCLUSION

We affirm the trial court's summary judgment dismissal of all claims of Jeff Brownfield.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Kulik, J.

31