# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56525-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ROBERT HOWARD CONE, | |
| Appellant. | |

CHE, J.—Robert Howard Cone's daughter, Rachel Ocampo, lived with him. They got into a dispute when Cone left the door to the porch open, and Ocampo raised concerns about the air quality. During the dispute, Cone put his hands around Ocampo's neck for several seconds, causing a scratch.

Officer Tim McNall arrived at Cone's home and found Cone alone on a bench outside of the home. McNall stood five feet away from Cone and asked him what happened. Cone said he grabbed Ocampo around the neck with both hands. Cone also demonstrated what he did with his hands. The conversation lasted three to four minutes. McNall did not inform Cone of his *Miranda*[1] rights before asking him what happened. The State charged Cone with second degree assault. At the CrR 3.5 hearing, the trial court determined that Cone's pre-*Miranda* statements were admissible as the interrogation was not custodial.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The jury convicted Cone of fourth degree assault. The trial court found Cone to be indigent. The trial court imposed a $500 victim penalty assessment, a $100 domestic violence penalty assessment, and a $100 deoxyribonucleic acid (DNA) collection fee. The trial court also ordered interest to accrue on the legal financial obligations (LFOs).

Cone appeals, arguing (1) the trial court erred by admitting his pre-*Miranda* statements because he was in custody when McNall interrogated him; (2) the imposition of the victim penalty assessment and the DNA collection fee violated the state and federal excessive fines clauses; (3) the trial court abused its discretion by imposing the domestic violence penalty assessment; and (4) the trial court erred by ordering interest to accrue on Cone's non-restitution LFOs. The State concedes that the domestic violence penalty assessment and the interest accrual provision of the judgment and sentence should be stricken.

We hold (1) the trial court did not err in admitting the pre-*Miranda* statements as Cone was not in custody when he made the incriminating statements; (2) the victim penalty assessment and DNA collection fee do not violate either the state or the federal excessive fines clauses; and (3) the trial court erred in ordering interest to accrue on the LFOs. We accept the State's concession that the domestic violence penalty assessment was improperly imposed. We remand for the trial court to revise the judgment and sentence to strike the provision imposing interest on any non-restitution LFOs and the domestic violence penalty assessment. Otherwise, we affirm.

FACTS

Ocampo and her children lived with her parents. On September 15, 2020, Ocampo was preparing lunch in the kitchen when Cone opened a nearby sliding glass door to retrieve a feather from outside. It was a smoky day. Ocampo, who has asthma, asked Cone to close the door due to the air quality.

2

Cone ignored the request and came inside to get birdseed and peanuts to feed the birds. After Cone came inside, Ocampo quickly went to close the door. But Cone then went back outside bumping Ocampo, which prevented her from shutting the door. Cone testified that Ocampo followed him outside and started pushing him. Ocampo then forcibly took the bag of peanuts out of Cone's grip and threw it off the deck. Cone then testified he tried to go back inside, but Ocampo continued pushing him and then grabbed him. Cone put his hands around Ocampo's neck, and said, "[d]o you want to go down the stairs?" Rep. of Proc. at 315-16. Cone released Ocampo seconds afterward, leaving a scratch on her neck.

Subsequently, Ocampo went inside and told her mother to call 911. Eventually law enforcement responded to a call by Ocampo, and Officer McNall came to the home. McNall approached Cone who was sitting on a bench outside his home in an open area. McNall asked Cone if he had calmed down. Cone said that he had.

McNall then asked Cone what happened. Cone said that his daughter attacked him. Cone had a scratch on his jaw line; but it is not clear how the scratch occurred. McNall then asked Cone if he grabbed his daughter around the neck. Cone said that he had and then demonstrated how he grabbed her to McNall. The initial interaction with McNall and Cone lasted three to four minutes.

Officer Langman arrived during McNall's contact with Cone, but after Cone's statements were made. Both officers stood about five feet away from Cone while speaking with him. Neither officer made any threats or promises to Cone in connection with his statements. Cone remained seated during the interaction. At some point, McNall went to contact Ocampo while Langman remained with Cone. McNall returned about ten minutes later to have a subsequent conversation with Cone.

3

After investigating, McNall arrested Cone. The State charged Cone with second degree assault. Cone moved for a CrR 3.5 hearing to suppress his pre-*Miranda* statements. At the hearing, McNall testified that Cone was not free to leave during the questioning because he would have detained him via a *Terry* stop, but he did not convey his intent to Cone.[2] The trial court determined that the pre-*Miranda* statements were admissible because Cone's statements were not made during a custodial interrogation.

The jury convicted Cone of fourth degree assault. The trial court found Cone to be indigent. The trial court then imposed a $500 victim penalty assessment, a $100 domestic violence penalty assessment, and a $100 DNA collection fee. The trial court also ordered interest to accrue on the aforementioned LFOs.

Cone appeals.

## ANALYSIS

### I. PRE-MIRANDA STATEMENTS

Cone argues that the trial court erred by admitting his pre-*Miranda* statements made to a law enforcement officer under circumstances amounting to a custodial interrogation. We disagree.

"We review challenged findings of fact entered after a CrR 3.5 hearing for substantial evidence and review de novo whether the trial court's conclusions of law are supported by its findings of fact."[3] *State v. Rosas-Miranda*, 176 Wn. App. 773, 779, 309 P.3d 728 (2013).

---

[2] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed. 2d 889 (1968).
[3] Cone does not challenge the trial court's CrR 3.5 findings of fact, and thus, they are verities on appeal. *State v. Lorenz*, 152 Wn.2d 22, 30, 93 P.3d 133 (2004).

Consequently, we review the trial court's determination of whether a suspect was in custody for purposes of *Miranda* de novo. *Id.*

When an agent of the state engages in custodial interrogation of a suspect, the agent must inform the suspect of their *Miranda* rights. *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). If the agent fails to inform the suspect of their *Miranda* rights in that situation, the suspect's statements are presumed to be involuntary. *Id.*

Custodial interrogation occurs where a state agent initiates the questioning of a suspect "after [] [the suspect] has been taken into custody or otherwise deprived of [their] freedom of action in any significant way." *Id.* at 217 (quoting *Miranda*, 384 U.S. at 444). If "a reasonable person in a suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest", they are in custody. *Id.* at 218. In making that determination, we examine the totality of the circumstances. *Rosas-Miranda*, 176 Wn. App. at 779.

If a state agent subjects a suspect to a routine *Terry* stop, the suspect is not in custody. *Heritage*, 152 Wn.2d at 218. To that end, an agent "may ask a moderate number of questions during a *Terry* stop to determine the identity of the suspect and to confirm or dispel the [agent]'s suspicions without rendering the suspect 'in custody'" *Id.* In *State v. Hilliard*, the court held that the suspect was not in custody even though they would not have been allowed to leave until he answered questions. 89 Wn.2d 430, 435-36, 573 P.2d 22 (1977).

But where a state agent interrogates a suspect in their own home and the circumstances of the interrogation turn the home into a "police-dominated atmosphere," the suspect is in custody. *Rosas-Miranda*, 176 Wn. App. at 783 (citing *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008)). In *Craighead*, the Ninth Circuit determined that the following factors were relevant to whether the home turned into such an environment:

5

(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

539 F.3d at 1084. That list is not exhaustive. *Id.* Indeed, the duration and character of the questioning are also relevant to whether the suspect is in custody. *State v. Escalante*, 195 Wn.2d 526, 534, 461 P.3d 1183 (2020).

In *Craighead*, eight armed law enforcement officers executed a search warrant on Craighead's residence, and some of the officers unholstered their weapons near Craighead. 539 F.3d at 1078. The officer in charge informed Craighead that he was free to leave but then directed him to a storage room at the back of his house for a private interview without informing him of his *Miranda* rights. *Id.* at 1078-79. The interview lasted twenty to thirty minutes. *Id.* at 1078. During the interview, another officer leaned against the wall near the only exit in the storage room, and the door to exit the room was closed. *Id.* The officers did not make threats or promises to induce Craighead to speak. *Id.* at 1079. Craighead made incriminating statements during the interview. *Id.* Under the aforementioned factors, the Ninth Circuit held that Craighead was in custody as the law enforcement officers turned the residence into a police-dominated environment, like being in formal custody. *Id.* at 1089. The Ninth Circuit emphasized that Craighead reasonably believed he could not leave when he was escorted to the storage room with an armed officer standing by the only exit. *Id.*

In contrast, in *Rosas-Miranda*, three officers knocked on Angel Rosas-Miranda's door. 176 Wn. App. at 775. The lead officer asked if they could search Angel's apartment, which he and his sister, Elvia, eventually consented to. *Id.* at 776. Eight or nine officers searched the apartment for about ninety minutes. *Id.* The lead officer stayed in the living room with Angel

and Elvia during the search. *Id.* at 776-77. The lead officer did not tell them they had to stay there or otherwise restrict their movement. *Id.* at 777. Eventually, the officers found drugs and firearms. *Id.* The lead officer asked Elvia about residue near a toilet that the officers suspected was heroin; this conversation occurred within earshot of Angel. *Id.* at 777, 785. Elvia divulged that she was frightened when the officers arrived and decided to flush the heroin that Angel brought to the apartment down the toilet. *Id.* at 777. Under these circumstances, we held that Elvia was not in custody. *Id.* at 786.

Here, even if we assume without deciding that the *Craighead* factors apply, we hold that Cone was not in custody at the time of his statements. First, McNall was the only officer present when Cone made his incriminating statement—a far cry from the eight officers in *Craighead*. McNall was uniformed and armed but did not unholster his firearm. While another officer arrived during McNall's contact with Cone, the statements at issue were made when only McNall was on the scene making the additional officer irrelevant for purposes of this analysis. Consequently, the number of officers factor weighs against finding that there was a police-dominated atmosphere.

Second, McNall did not restrain, threaten, or promise anything to Cone to induce his statements. Cone was not restrained during McNall's contact.[4] Cone sat on a bench outside his home, five feet away from McNall, during the initial contact. The bench was located in an open area of the residence that was not enclosed in any way, wholly unlike the cluttered storage room in *Craighead*, which had one closed exit with an armed officer standing nearby while Craighead

---

[4] Cone emphasizes that McNall did not intend to let him go based on a statement the officer made during his cross-examination in the CrR 3.5 hearing. But this intent was not conveyed to Cone during the initial contact. And the officer's unstated intent is irrelevant to the custody determination. *Lorenz*, 152 Wn.2d at 37.

7

was questioned by another officer. 539 F.3d at 1078. Consequently, the restraint factor also weighs against finding that there was a police-dominated atmosphere.

Third, Cone was alone outside. Although we recognize that isolated interrogation without the moral support of others can encourage the divulgence of inculpatory statements, *Craighead*, 539 F.3d at 1087, McNall did not isolate Cone from friends or family. Rather, McNall merely approached Cone where he was located, outside his home sitting on a bench. This factor is neutral as to whether there was a police-dominated atmosphere.

Fourth, McNall did not tell Cone that he was free to leave or terminate the three to four minute contact. While the initial contact was short, not advising Cone that he was free to leave or terminate the contact weighs in favor of finding that there was a police-dominated atmosphere.

Under these circumstances, we hold that Cone was not in custody, *Miranda* warnings were not required, and Cone's statement and related demonstration to McNall were admissible as evidence. Thus, the trial court did not err in admitting Cone's pre-Miranda statements and demonstration.

## II. EXCESSIVE FINES

Cone argues that the victim penalty assessment and the DNA collection fee violate the state and federal excessive fines clauses as those fees are at least partially punitive and were excessive as he was indigent when those fees were imposed. Cone argues that the state excessive fines clause is more protective than its federal counterpart. Cone also appears to argue that the victim penalty assessment and the DNA collection fee violate the state and federal excessive fines clauses as courts are not required to conduct a proportionality review before imposing those fees. Cone's arguments fail.

No. 56525-1-II

Article I, section 14 of the Washington constitution and the Eighth Amendment to the United States Constitution both prohibit excessive fines. The federal excessive fines clause is applicable to the states by incorporation through the Fourteenth Amendment's due process clause. *Timbs v. Indiana*, __ U.S. __, 139 S. Ct. 682, 686, 203 L. Ed. 2d 11 (2019).

We first reject Cone's argument that the state excessive fines clause is more protective than its federal counterpart. Division One, applying *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), has held that the state excessive fines clause does not provide more protection than its federal counterpart. *State v. Tatum*, 23 Wn. App. 2d 123, 133, 514 P.3d 763, *review denied*, 200 Wn.2d 1021 (2022); *see also State v. Ramos*, 24 Wn. App. 2d 204, 217, 520 P.3d 65 (2022), *review denied*, 200 Wn.2d 1033 (2023). We agree and interpret the federal and state excessive fines clauses to be coextensive, not more extensive. Thus, we analyze the rest of the related issues under state cases involving federal excessive fine clause jurisprudence.

To violate the federal and state constitutional prohibition on excessive fines, the sanction must be a "fine" and be "excessive." *City of Seattle v. Long*, 198 Wn.2d 136, 162, 493 P.3d 94 (2021). We review whether a fine is constitutionally excessive de novo. *Id.* at 163. "[Q]ualifying fines must be at least 'partially punitive.'" *Id.* (quoting *Timbs* 139 S. Ct. at 689). A fine is excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Long*, 198 Wn.2d at 166.

Turning to the victim penalty assessment fee, when a person is found guilty of a felony or gross misdemeanor in superior court, the court shall impose a $500 victim penalty assessment. RCW 7.68.035(1)(a). RCW 7.68.035(1) is mandatory and there is no provision in the statute to waive the penalty for indigent defendants. *State v. Curry*, 118 Wn.2d 911, 917, 829 P.2d 166 (1992). If an indigent defendant is unable to pay the victim penalty assessment fee, there are

9

sufficient safeguards in the current sentencing scheme to prevent unlawful imprisonment based upon their inability to pay the penalty assessment unless the court finds the violation is willful. *Id.* at 918. Our Supreme Court has held that the victim penalty assessment is not facially unconstitutional nor as applied to indigent defendants. *Id.* at 917-918.

We are bound by the holding in *Curry*. *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) (the Supreme Court's interpretation of state law is binding on lower courts). Consequently, the victim penalty assessment is facially constitutional and constitutional as applied to Cone. Cone's arguments to the contrary fail.

As to the DNA collection fee, RCW 43.43.7541 requires courts to impose a $100 DNA collection fee for every sentence imposed for specified crimes "unless the state has previously collected the offender's DNA as a result of a prior conviction." The DNA fee is "constitutional because its purpose is monetary, rather than punitive." *Tatum*, 23 Wn. App. 2d at 131; *see also State v. Mathers*, 193 Wn. App. 913, 920, 376 P.3d 1163 (2016) (noting that the DNA collection fee does not have a punitive purpose). We agree and hold that the DNA collection fee's purpose is monetary, not punitive. Because the DNA collection fee's purpose is not punitive, we need not consider whether the DNA collection fee was excessive here.

Finally, we reject Cone's argument that the DNA collection fee and victim penalty assessment are unconstitutional under the federal and state excessive fines clauses because courts are not required to conduct a proportionality review before imposing those fees. First, our Supreme Court upheld the constitutionality of the victim penalty assessment, a mandatory fee, *Curry*, 118 Wn.2d at 917, which is inconsistent with a holding that the victim penalty assessment and DNA collection fee are unconstitutional merely because courts don't have to engage in a proportionality review before imposing those LFOs. Second, our state courts have consistently

held that trial courts do not need to consider the defendant's ability to pay when imposing the victim penalty assessment or DNA collection fee. *Mathers*, 193 Wn. App. at 918. Third, neither *Long*, 198 Wn.2d at 136 nor *Timbs*, 139 S. Ct. at 682 suggest that all mandatory fines are per se unconstitutional because they don't require courts to conduct a proportionality review before imposing them.[5] Consequently, we hold that the victim penalty assessment and the DNA collection fee are not unconstitutional merely because they do not require the trial court to conduct a proportionality analysis before imposing them.

In sum, we hold that the trial court's imposition of the victim penalty assessment and DNA collection fee did not violate either the state or federal excessive fines clauses.

### III. DOMESTIC VIOLENCE PENALTY ASSESSMENT

Cone argues that the domestic violence penalty assessment must be stricken because he is indigent, and the assessment results in a financial hardship for the rest of his family. The State concedes that this assessment should be stricken.

Under RCW 10.99.080(1), superior courts have discretion to impose a domestic violence penalty assessment of up to $100 on any adult offender convicted of a crime involving domestic violence. The statute encourages the superior court to "solicit input from the victim or representatives for the victim in assessing the ability of the convicted offender to pay the penalty, including information regarding current financial obligations, family circumstances, and ongoing restitution." RCW 10.99.080(5). We review legal issues regarding LFOs de novo, and the trial

---

[5] Cone suggests that *Long*, 198 Wn.2d at 136 and *Timbs*, 139 S. Ct. at 682 conflict with *Curry*, 118 Wn.2d at 917. But Cone fails to explain how these opinions conflict with one another. Each party must supply argument in support of the issues presented for review. RAP 10.3(a)(6). "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Brownfield v. City of Yakima*, 178 Wn. App. 850, 876, 316 P.3d 520 (2014). Consequently, we decline to address this argument.

No. 56525-1-II

court's ultimate decision whether to impose LFOs for an abuse of discretion. *State v. Smith*, 9 Wn. App. 2d 122, 126, 442 P.3d 265 (2019), *amended on recons.*, (Aug. 20, 2019).

The trial court found Cone to be indigent and struck other discretionary LFOs. Thus, we accept the State's concession.

IV. INTEREST ACCRUAL ON LFOS

Cone argues that the trial court erred by ordering interest to accrue on the non-restitution LFOs. The State concedes that the interest accrual provision should be stricken. We agree.

"As of June 7, 2018, no interest shall accrue on nonrestitution legal financial obligations." RCW 10.82.090(1).

On November 16, 2021, the superior court ordered the LFOs to bear interest under RCW 10.82.090. Consequently, the trial court erred in ordering interest to accrue on the non-restitution LFOs.

CONCLUSION

We hold (1) the trial court did not err in admitting the pre-*Miranda* statements as Cone was not in custody when he made the incriminating statements; (2) the victim penalty assessment and DNA collection fee do not violate either the state or the federal excessive fines clauses; and (3) the trial court erred in ordering interest to accrue on the LFOs. We accept the State's concession that the domestic violence penalty assessment was improperly imposed. We remand for the trial court to amend the judgment and sentence to strike the provision imposing interest on any non-restitution LFOs and the domestic violence penalty assessment. Otherwise, we affirm.

12

No. 56525-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

_____

Price, J.