FILED
COURT OF APPEALS
DIVISION II

2013 SEP 17 AM 8: 38

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42630-7-II |
| Respondent, | |
| v. | PUBLISHED OPINION |
| ELVIA ROSAS-MIRANDA, | |
| Appellant. | |

BJORGEN, J. — Elvia Rosas-Miranda appeals her two convictions for unlawful possession

of a controlled substance with intent to deliver; one involving heroin and one methamphetamine,

each with a school bus stop enhancement. She alleges that the trial court erred in denying her

motion to suppress her statements because the police did not give *Miranda*[1] warnings before

questioning her. The State argues that *Miranda* warnings were not required because she was not

in custody while questioned in her home during a consensual search. We agree with the State

that she was not in custody. Thus, her statements to police are admissible in the absence of

*Miranda* warnings, and the trial court did not err in denying her motion to suppress the

statements. Accordingly, we affirm.

## FACTS

On January 14, 2011, police officers arrested Carlos Rosas-Miranda for selling heroin.[2]

Based on statements by Carlos and a search of his apartment, officers became interested in

another apartment in the same complex, apartment #AA11, because Carlos had lived there

previously and continued to use the address to register his vehicles. The police suspected that

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] For clarity, we refer to the Rosas-Miranda siblings by their first names. In doing so, we intend
no disrespect.

someone living in apartment #AA11 might be involved in selling drugs or that drugs and firearms would be present.

The police did not obtain a warrant to search apartment #AA11. Instead, Detective Shane Hall from the Vancouver Police Department Drug Task Force knocked on the door of the apartment to attempt to obtain consent to a search. Hall was dressed in plainclothes, but was wearing a tactical vest with the word "POLICE" on it. Report of Proceedings (Aug. 20, 2011) at 22. The vest included handcuffs, small tools, and a holster. Sergeant Pat Moore and another drug task force detective stood with Hall at the door. Additional officers were present, but out of view. Angel Rosas-Miranda opened the door and identified himself. Angel told Hall that he spoke Spanish only, so Hall, who was fluent in Spanish, communicated with Angel in that language. Angel said that he lived in the apartment with his sister, Elvia, and a number of children. Hall explained to Angel that the police had arrested Carlos on drugs and weapons charges and that they were concerned that someone at apartment #AA11 may be involved or there might be additional drugs or guns present. Angel stated, "No, there's not." RP (Aug. 10, 2011) at 17. Hall asked Angel if the police could search his residence, and Angel responded, "Yes, you can check." RP (Aug. 10, 2011) at 17. Hall told Angel that he needed to speak with all the adult residents, specifically Elvia, before searching the apartment.

Angel stepped back into his apartment out of Hall's view and called out for Elvia, who responded that she was in the bathroom. After a few minutes, Hall asked Angel if Angel could check on Elvia and see if she would be coming to the door. Angel went to check on Elvia, leaving Hall at the door. After a few minutes, Hall called out into the apartment asking whether they were going to return. Eventually, Angel and Elvia came to the door.

2

Hall explained to Elvia that the police had arrested Carlos for drugs and weapons charges and that they were at Elvia and Angel's apartment to investigate whether they had any weapons or drugs. Hall advised Elvia and Angel that the police wanted to search their apartment, but that they had a right to refuse consent and could revoke or limit consent at any time. Hall then asked if Elvia and Angel were still willing to permit the search and they both said, "[S]í," the Spanish word for "yes." Supp. Clerk's Papers (SCP) at 86.

Once Elvia and Angel consented to the search of their apartment, Hall asked to speak with them in the front living room, while other officers searched the apartment. Eight or nine officers participated in the search, which took approximately 90 minutes. During the search, Hall remained in the front living room with Elvia, Angel, and the children, but he did not tell them to stay in the living room or to stay out of the other rooms. Hall did not put Angel or Elvia in handcuffs, direct them to sit on the couch, or otherwise restrict their movement.[3] Hall made a concerted effort to remain in earshot of Elvia and Angel during the search in case they wanted to revoke or limit consent, because Hall was the only officer present who could communicate in Spanish. Occasionally, Hall asked to speak with Angel or Elvia privately, but he remained in earshot of the other person. Hall also stepped outside the apartment for approximately two minutes to speak with visitors who approached the apartment during the search.

---

[3] At the suppression hearing, Elvia disputed whether her movement was restricted. Hall testified that he asked Elvia and Angel to talk to him in the living room with the children, but did not require them to stay there or accompany him anywhere. However, Elvia said when she tried to get up, another officer lowered his hand in a motion that she understood to mean that he wanted her to stay with the children. The trial court found that Angel's and Elvia's "movements were not restricted within their own residence" "nor were [they] instructed that they had to remain in only one area of their residence." SCP at 87, 89. The trial court's findings on these points are supported by substantial evidence in the record.

3

Police found both drugs and firearms. Hall asked Elvia about some plastic packaging material with residue that they found in the bathroom next to the toilet that the police suspected was heroin. Elvia told Hall that her brother, Carlos, had brought heroin to the apartment a few weeks earlier. She said that when the police came to the door, she was frightened so she retrieved the drugs from the closet and flushed the heroin down the toilet.

After the conclusion of the search, Hall arrested Elvia and Angel for possession of drugs and, in Angel's case, for illegal possession of firearms. At that time, Hall put Elvia and Angel in handcuffs. Hall did not ask Elvia and Angel questions or otherwise attempt to elicit statements from them after he arrested them; nor did he advise Angel or Elvia of their *Miranda* rights.

The State charged Elvia with two counts of unlawful possession of a controlled substance with intent to deliver (heroin and methamphetamine) within 1,000 feet of a school bus stop. Angel was charged with similar and additional crimes.

Before trial, Elvia and Angel moved to suppress the physical evidence obtained during the search and the statements they made to Hall. The trial court conducted a suppression hearing under both CrR 3.5 and CrR 3.6, during which Hall, Angel, and Elvia testified. The trial court denied the motions to suppress, concluding that (1) the search was a valid search because Elvia and Angel voluntarily consented to the search of their residence after being advised of their rights under *Ferrier*[4]; and (2) *Miranda* warnings were not required before eliciting statements offered by the State because Elvia and Angel were not in custody at the time the statements were given.

---

[4] *State v. Ferrier*, 136 Wn.2d 103, 118, 960 P.2d 927 (1998).

No. 42630-7-II

Elvia and Angel were tried in a joint jury trial and were found guilty as charged. Elvia was sentenced to a total standard range sentence of 40 months in prison. She timely appeals.[5]

## ANALYSIS

The only issue on appeal is whether Elvia was in custody for purposes of *Miranda* when she told Hall, in response to his questions, that she had just flushed heroin down the toilet.[6] We hold that she was not in custody when she made this statement and, therefore, the trial court did not err in admitting the statement as evidence.

### I. STANDARD OF REVIEW

We review challenged findings of fact entered after a CrR 3.5 hearing for substantial evidence and review de novo whether the trial court's conclusions of law are supported by its findings of fact. *State v. Solomon*, 114 Wn. App. 781, 789, 60 P.3d 1215 (2002). Thus, we review de novo the trial court's determination that Elvia was in custody when she told Hall that she had just flushed heroin down the toilet. *See State v. Lorenz*, 152 Wn.2d 22, 36, 93 P.3d 133 (2004).

### II. ADMISSIBILITY OF ELVIA'S STATEMENT

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.

---

[5] After Elvia and Angel filed a consolidated appeal, we granted Angel's motion to dismiss his appeal with prejudice. Thus, only Elvia's appeal remains.

[6] Elvia also assigned error to the trial court's failure to enter written findings of fact and conclusions of law under CrR 3.5 at the suppression hearing, arguing that the proper remedy was to remand to the trial court for entry of the absent findings and conclusions. The trial court entered its written findings of fact and conclusions of law on April 6, 2012, and we granted the State's motion to supplement the record. Thus, the only remaining issue on appeal is whether Elvia was in custody when she made the challenged statement.

5

Police must give *Miranda* warnings when a suspect is subject to interrogation while in the coercive environment of police custody. *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). "Without *Miranda* warnings, a suspect's statements during custodial interrogation are presumed involuntary." *Heritage*, 152 Wn.2d at 214.

A suspect is in custody for purposes of *Miranda* when "a reasonable person in a suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest." *Heritage*, 152 Wn.2d at 218 (citing *Berkemer v. McCarty*, 468 U.S. 420, 441-42, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)). Courts examine the totality of the circumstances to determine whether a suspect was in custody. *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008). Police questioning within the confines of a person's own home may be custodial interrogation. *Orozco v. Texas*, 394 U.S. 324, 326-27, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969); *State v. Dennis*, 16 Wn. App. 417, 421, 558 P.2d 297 (1976).

In *Dennis*, 16 Wn. App. at 421-22, we held that a suspect was in custody in his own apartment. In that case two officers approached the suspect's apartment to execute a search warrant and they discovered that the address on the search warrant was incorrect. *Dennis*, 16 Wn. App. at 418. One officer stayed outside the apartment while the other went to obtain a corrected warrant. *Dennis*, 16 Wn. App. at 418. When the suspect and his wife arrived home, a neighbor beckoned the suspect into an adjoining apartment while the suspect's wife went into the apartment she shared with the suspect. *Dennis*, 16 Wn. App. at 418-19. The officer waiting at the apartment complex became worried that the neighbor would tell the suspect that he was a police officer and that the suspect would return to his apartment and destroy contraband before the other officer arrived with the corrected search warrant. *Dennis*, 16 Wn. App. at 419. To

6

avoid that, the officer knocked on the suspect's door, identified himself, and was granted permission to enter by the suspect's wife. *Dennis*, 16 Wn. App. at 419-20.

When the suspect returned from the neighbor's apartment, the officer was already inside the apartment. *Dennis*, 16 Wn. App. at 419. The officer, the suspect, and the suspect's wife sat down at the kitchen table and the officer told the suspect that he knew there were drugs in the refrigerator. *Dennis*, 16 Wn. App. at 419. The suspect was not placed under arrest or told that he could not leave, but when the suspect's wife requested that the officer move into the living room, he responded, "No, because I don't like to see you take anything out of the refrigerator that I cannot see." *Dennis*, 16 Wn. App. at 420. The officer suggested that the suspect produce the drugs voluntarily and save him the trouble of searching. *Dennis*, 16 Wn. App. at 419. The officer then told the suspect that another officer would return shortly with a search warrant. *Dennis*, 16 Wn. App. at 419. The officer again asked for the drugs to be produced without resorting to a search. *Dennis*, 16 Wn. App. at 419. In response, the suspect retrieved several packages of cocaine from the refrigerator and placed them on the table next to the officer. *Dennis*, 16 Wn. App. at 419.

On appeal, we determined that the suspect was in custody for purposes of *Miranda* when, at the officer's urging, he took cocaine out of the refrigerator and set it on the table in front of the officer. *Dennis*, 16 Wn. App. at 422. We stated that "the atmosphere was . . . dominated by the officer's unwelcome presence and his insistence on remaining in a position where he could monitor and thus restrict the occupants' freedom of movement within their home." *Dennis*, 16 Wn. App. at 421-22. The officer also made it clear to the suspect that not cooperating would be futile because another officer was on his way with a search warrant. *Dennis*, 16 Wn. App. at

7

421-22. The suspect had reason to believe that he was not free to remove anything from the refrigerator and exit the room. *Dennis*, 16 Wn. App. at 422. We held that a reasonable person in the suspect's position would have "believed his freedom of movement was significantly restricted and that any attempt to leave would probably result in immediate physical restraint or custody." *Dennis*, 16 Wn. App. at 422. Thus, the suspect was in custody for purposes of *Miranda* and the officer should have advised him of his rights. *Dennis*, 16 Wn. App. at 422.

Under *Dennis* and *Craighead* we must determine whether, under the totality of the circumstances, a reasonable person in Elvia's position would have felt that her freedom was curtailed to a degree associated with formal arrest. *Dennis* is a helpful comparison because both interrogations occurred inside the suspects' residences after officers were granted permission to enter. The officer's manner of entry in *Dennis*, however, was more coercive and secretive. Here, in contrast, Hall insisted on receiving consent from both Angel and Elvia before entering their apartment. After being informed that she was free to withhold, limit, or revoke consent, Elvia expressly consented to Hall's entering and searching her apartment. The circumstances in *Dennis* were more coercive and created a police-dominated atmosphere not present here.

Also, the officer in *Dennis* impressed upon the suspect that the officer was in control, even inside the suspect's apartment. As noted, the officer refused to move into another room when the suspect's wife suggested it, insisted that he remain in the kitchen to monitor the suspect and the refrigerator, and asked the suspect to retrieve drugs that he suspected were in the refrigerator. When the officer told the suspect that a search warrant was on its way, the suspect immediately produced the drugs. Based on the officer's statements and conduct, a reasonable

person in the suspect's position would believe that the officer was in control of the situation developing in the suspect's apartment.

In contrast, Hall stayed within earshot of Elvia and Angel during the search of their apartment in case either person wanted to revoke or limit consent, but he did not restrict their movement or tell them he was monitoring them. At times, Hall asked to speak to either Elvia or Angel around the corner in the hall, presumably out of sight from the other person, and he even stepped out of the apartment for a few minutes to translate for another officer. Moreover, Elvia was advised that the search of her apartment was voluntary and that she could revoke or limit consent at any time. Unlike in *Dennis*, the officers did not undercut Elvia's control by telling her that a search was inevitable. A reasonable person in Elvia's position would feel that she controlled the officers' presence in her apartment. A reasonable person would feel that she controlled whether the search would occur or continue. Thus, the atmosphere in Elvia's apartment was considerably less coercive and police-dominated than in *Dennis*, despite the presence of eight or nine officers in Elvia's apartment compared to only two officers in *Dennis*.

Because Elvia claims a violation of the Fifth Amendment, the Ninth Circuit's decision in *Craighead* is especially pertinent. In applying the dictates of *Miranda* to an in-home interrogation, *Craighead* focused on the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a "police-dominated atmosphere." *Craighead*, 539 F.3d at 1083-84. In its analysis the Ninth Circuit concluded that several factors were relevant to whether an interrogation created such an atmosphere:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by

9

threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

*Craighead*, 539 F.3d at 1084.

In *Craighead* eight law enforcement officers from three different agencies went to Craighead's residence to execute a search warrant. *Craighead*, 539 F.3d at 1078. All of the officers were armed and some unholstered their firearms in Craighead's presence. *Craighead*, 539 F.3d at 1078. The officer in charge introduced herself and told Craighead that he was not under arrest, that any statement he might make would be voluntary, that he would not be arrested that day, and that he was free to leave. *Craighead*, 539 F.3d at 1078. Craighead was directed to a storage room at the back of his house for a private interview, but was not given *Miranda* warnings. *Craighead*, 539 F.3d at 1078-79. The officer in charge interviewed Craighead for approximately 20 to 30 minutes, while another officer leaned against the wall near the only exit with his back to the closed door. *Craighead*, 539 F.3d at 1078. Craighead was never handcuffed. *Craighead*, 539 F.3d at 1078. No threats or promises were made to induce him to speak, nor was any force used. *Craighead*, 539 F.3d at 1079. During the interview Craighead confessed to possessing child pornography. *Craighead*, 539 F.3d at 1079. He was not arrested at the end of the interview, but he was later charged with various crimes related to possession and distribution of child pornography. *Craighead*, 539 F.3d at 1079.

Based on the totality of the circumstances and applying its announced factors, the Ninth Circuit reasoned that although Craighead was told that he was free to leave and that the interview was voluntary, the other circumstances weighed in favor of finding that Craighead's home had a police-dominated atmosphere akin to formal custody. *Craighead*, 539 F.3d at 1089. Craighead

reasonably believed that there was nowhere for him to go when he was escorted to a storage room in his own home and observed by an armed guard standing by the only exit. *Craighead*, 539 F.3d at 1089. Thus, the Ninth Circuit held that Craighead was in custody for purposes of *Miranda*. *Craighead*, 539 F.3d at 1089.

Here application of the factors the Ninth Circuit suggested in *Craighead* leads to the same conclusion as our analysis of *Dennis*: that Elvia was not in custody. The first factor is the number of law enforcement personnel and whether they were armed. *Craighead*, 539 F.3d at 1084. Eight or nine police officers participated in the search of Elvia's apartment. Only Hall and two other officers, however, initially approached the door and requested permission to search the apartment. Only Hall questioned Elvia. The record does not reflect whether the officers were armed.[7] As in *Craighead*, the number of officers present weighs in favor of a police-dominated atmosphere. *See Craighead*, 539 F.3d at 1085. But in *Craighead* the eight officers, some with their weapons drawn, entered the suspect's home with a search warrant. . *Craighead*, 539 F.3d at 1085. Here, the eight or nine officers entered Elvia's apartment with her consent, and there is nothing in the CrR 3.5 hearing record to suggest that the officers, if armed, unholstered their firearms in Elvia's presence.

The second factor is whether the suspect was restrained by physical force or by threats. *Craighead*, 539 F.3d at 1084-85. In *Craighead* the suspect was not physically restrained by force or threats; but he was interviewed in a closed storage room with an armed guard leaning near the door, suggesting that he was not free to leave. *Craighead*, 539 F.3d at 1085-86. Elvia was not restrained during the search of her apartment and questioning by Hall. The trial court

---

[7] Hall testified that he wore a tactical vest that said "POLICE," and that the vest had handcuffs, a holster for his firearm, and other small tools. RP (Aug. 10, 2011) at 22.

11

expressly found that Elvia was not handcuffed, not told to stay in one area of the apartment, and not told to stay out of any area of the apartment. As shown in the discussion of the facts, above, these findings are supported by substantial evidence in the record. The absence of restraint weighs against a finding that the atmosphere in Elvia's apartment was police-dominated.

The third factor is whether the suspect was isolated from others. *Craighead*, 539 F.3d at 1084, 1086. In *Craighead* the suspect was escorted to and interviewed in a small storage room at the back of his residence. *Craighead*, 539 F.3d at 1078, 1087. This created a police-dominated atmosphere inside the suspect's home by eliminating the comfortable and familiar surroundings that are the hallmark of an in-home interrogation. *See Craighead*, 539 F.3d at 1083-84, 1087-88. Here, Elvia was not isolated from others. Elvia, Angel, and the children remained, for the most part, together in the front living area. Hall spoke to Elvia privately in the hall around the corner from the living room, but stayed within earshot of Angel. Arguably, the officers isolated Elvia and Angel from their guests that approached the apartment during the search, but the record does not provide details other than that Hall stepped outside to talk to them and that Elvia and Angel did not. The third factor weighs slightly in favor of not finding a police-dominated atmosphere.

The fourth factor is whether the suspect was informed that he was free to leave or terminate the interview. *Craighead*, 539 F.3d at 1084, 1087. In *Craighead* the suspect was told that he was free to terminate the interview and leave, but that was belied by the armed guard leaning against the wall with his back toward the storage room's sole exit. *Craighead*, 539 F.3d at 1088. Moreover, a search warrant authorized the officers to search the suspect's home, so he could not expect the officers to leave until they completed their search. *Craighead*, 539 F.3d at 1083, 1089. Here, Elvia was not informed that she was free to leave or terminate the interview,

but she was advised that she was free to limit or revoke her consent to search her home at any time. Her ability to revoke consent and exclude the officers from her home is at least as potent an assertion of control as the ability to leave or terminate the interview. The fourth factor weighs against a finding that the atmosphere in Elvia's apartment during the interview was police-dominated.

In sum, the number of officers inside Elvia's apartment contributed to the police-dominated atmosphere and weighs in favor of a finding that Elvia was effectively in custody. However, the fact that the officers were present only through informed *Ferrier* consent from Elvia alleviates the police-dominated atmosphere even in the presence of many officers. The other factors weigh in favor of finding that Elvia was not in custody. She was not restrained or isolated and was informed that the search of her apartment was voluntary and could be revoked or limited at any time. Under the totality of the circumstances, a reasonable person in Elvia's position would not believe that her freedom was curtailed to a degree associated with formal arrest. *See Heritage*, 152 Wn.2d at 218. Thus, the trial court properly concluded that for purposes of *Miranda*, Elvia was not in custody, *Miranda* warnings were not required, and Elvia's statement to Hall was admissible as evidence. Accordingly, we affirm.

BJORGEN, J.

We concur:

PENOYAR, J.

WORSWICK, C.J.

13