# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52279-9-II |
| Respondent, | |
| v. | |
| KEITH BERNARD THREATTS, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, A.C.J. — Keith Threatts appeals his judgment and sentence after a jury found him guilty of unlawful possession of a firearm (UPFA) in the first degree, theft of a firearm, and UPFA in the third degree.

Threatts argues that the trial court erred by (1) denying his CrR 3.5 motion to suppress his statements to police officers because he had not been advised of his *Miranda*[1] rights, he was in police custody, and his statements were not voluntary, (2) denying his CrR 3.6 motion to suppress evidence because the search warrant was invalid, lacked probable cause, and relied on improper police conduct, and (3) denying his CrR 8.3(c) motion to dismiss because the court previously failed to advise him of the firearms prohibition as required under RCW 9.41.047(1)(a), and thus, the UPFA charge should have been dismissed. Threatts also argues that (4) he received ineffective assistance of counsel. Finally, Threatts argues that the trial court erred by (5) allowing him to

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

represent himself pro se at the sentencing hearing without determining that he knowingly, intelligently, and voluntarily waived his right to counsel, and (6) imposing a $100 DNA collection fee and a $200 criminal filing fee without determining whether Threatts had previously provided a DNA sample or had the ability to pay under the current LFO statutes and *State v. Ramirez.*[2]

We hold that the trial court did not err by (1) denying Threatts' CrR 3.5 motion to suppress his statements made to police officers, (2) denying his CrR 3.6 motion to suppress evidence because the evidence was lawfully seized, and (3) denying his CrR 8.3 motion to dismiss the UPFA charge because Threatts had been previously notified of the firearms prohibition as required under RCW 9.41.047(1)(a). We also hold that (4) Threatts did not receive ineffective assistance of counsel. We accept the State's concessions that the trial court erred by (5) allowing Threatts to represent himself pro se at the sentencing hearing because it failed to determine whether he knowingly, intelligently, and voluntarily waived his right to counsel, and (6) imposing a $100 DNA collection fee and a $200 criminal filing fee without conducting a prior inquiry under the current LFO statutes and *Ramirez.* We affirm Threatts' conviction, but we remand to the trial court for resentencing. The court must appoint counsel to represent Threatts and, after consultation with counsel, Threatts may withdraw his request for the court to impose a new sentence. Either way, on remand, the court must conduct an adequate individualized inquiry into whether Threatts has previously provided a DNA sample and whether he is indigent.

---

[2] 191 Wn.2d 732, 426 P.3d 714 (2018).

## FACTS

### I. BACKGROUND

A. MICHAEL NELSON

On July 31, 2015, Michael Nelson contacted the Vancouver Police Department to report a missing handgun. Corporal William Pardue and Officer David Chamblee arrived at Nelson's residence. They had been there earlier that day on an unrelated call. Nelson informed them that he believed his handgun had been stolen. Nelson had placed it on a shelf in his garage and taken a nap, and when he woke up from the nap, the handgun was missing.

Nelson told Corporal Pardue and Officer Chamblee that he believed Threatts had taken his handgun. Nelson knew Threatts because Threatts and Threatts' son had previously lived with Nelson. The day before the incident, Nelson was shopping for a handgun, and he saw Threatts. Nelson told Threatts that he was purchasing a handgun.

Nelson put the handgun on the shelf and went to take a nap at around 4:00 pm. When Nelson awoke from his nap at about 6:00 pm, he noticed that Threatts' hat was on a stand outside the front door. Nelson recognized Threatts' hat because he had seen him wear the hat multiple times. The hat was not there when Nelson went to take his nap. Threatts had not been at Nelson's house that day to Nelson's knowledge. Nelson tried to contact Threatts through phone calls, text messages, and various other messaging platforms, but Threatts was not responding. Threatts frequently had his phone with him and responded to text messages and phone calls quickly. Nelson also told Corporal Pardue and Officer Chamblee that Threatts was the only person aside from Nelson's family that Nelson allowed in his home.

B.  MEETING AT THREATTS' APARTMENT

Corporal Pardue and Officer Chamblee went to Threatts' apartment at about 11:00 pm. When they knocked on the door, a male voice asked who was at the door. Corporal Pardue responded that it was "Bill," which is Corporal Pardue's first name. Verbatim Report of Proceedings (VRP) (July 9, 2018) at 335. After a short period of time, Threatts opened the door. Corporal Pardue and Officer Chamblee were dressed in their full police uniforms.

Corporal Pardue told Threatts that they had his hat and wanted to speak with him. Threatts willingly went outside and shut the door behind him so that the three of them were standing on the landing of his apartment. Corporal Pardue asked Threatts if the hat was his, and Threatts responded that it was. Corporal Pardue informed Threatts that they had found the hat at Nelson's house and asked if Threatts had been there earlier, to which Threatts responded he had. Threatts told Corporal Pardue and Officer Chamblee that he had ridden his bike over there earlier, and Corporal Pardue informed Threatts that Nelson's handgun was missing.

After Corporal Pardue mentioned Nelson's handgun, Threatts became agitated. Threatts accused Corporal Pardue of lying to him so he would come outside by telling Threatts his name was "Bill." Corporal Pardue asked Threatts if he could go inside to look around, to which Threatts responded no. Threatts requested a sergeant or lieutenant come to the scene, so Corporal Pardue called on the radio for Sergeant Aaron Gibson to arrive. Once Sergeant Gibson arrived, Corporal Pardue informed Threatts that he could not go back into his apartment because they were going to apply for a search warrant. They did not allow him back into his apartment because of safety concerns and concerns that Threatts could attempt to destroy evidence.

4

Sergeant Gibson informed Threatts that he was free to leave, and if Threatts wanted, one of the officers would go inside to retrieve Threatts' sleeping son. Threatts declined the offer to retrieve his son, but he asked Officer Chamblee to go inside and pick up a pair of shorts for him. The officers offered multiple times to retrieve Threatts' son for him so they could go somewhere else, but Threatts continued to decline their offers.

C.  STATEMENTS TO POLICE

Eventually, Corporal Pardue left to obtain a search warrant. As the officers and Threatts were waiting outside the apartment for Corporal Pardue to return, Threatts "lowered his head and said you're going to find the gun." VRP (July 9, 2018) at 366. After this, Officer Chamblee read Threatts his *Miranda* rights and asked if Threatts still wanted to speak with him, to which Threatts replied he did. Threatts continued speaking with the officers. Threatts told them that he and his son went to Nelson's house, and he saw his son with the handgun in his hands. Threatts thought the handgun was fake and grabbed it from his son, but when he realized it was real, he put it in his back pocket and left. Threatts told the officers he had known that Nelson had his concealed weapons license and that Nelson was planning on purchasing a handgun.

Officer Chamblee told Threatts that he was a convicted felon, and therefore, Threatts could not lawfully possess a firearm. Threatts said he did not believe that he was a felon. Threatts told the officers he "didn't want to be in trouble for possessing it." VRP (July 9, 2018) at 370.

When Corporal Pardue returned with the search warrant, the officers executed the search warrant of Threatts' apartment. Inside, they found a Smith & Wesson 9 millimeter handgun matching the description of Nelson's stolen handgun inside a duffle bag.

5

The State charged Threatts with one count of UPFA in the first degree, one count of theft of a firearm, and one count of UPFA in the second degree.

## II. PROCEDURAL HISTORY

### A. PRE-TRIAL MOTIONS

On December 7, 2016, the trial court held a hearing on Threatts' CrR 3.5 motion to suppress statements made to the police officers, a hearing on Threatts' CrR 3.6 motion to exclude evidence seized during the execution of the search warrant at his apartment, and a hearing on Threatts' motion to dismiss the UPFA charge. At the hearings, Threatts testified, as well as Corporal Pardue and Officer Chamblee. The court denied all three motions and entered written findings of fact and conclusions of law consistent with the above facts.

### 1. CrR 3.5 Motion

In his CrR 3.5 motion to suppress the statements made to the police, Threatts argued that the police officers had not yet advised him of his *Miranda* rights, his statements were made while he was in police custody, and they were not made voluntarily. The court disagreed and denied the motion.

### 2. CrR 3.6 Motion

In his CrR 3.6 motion to suppress the handgun, Threatts argued that the search warrant was invalid, lacked probable cause, and relied on improperly obtained statements by him and a lengthy detention of four hours on the landing of his apartment. The trial court disagreed and ruled that there was probable cause and that the evidence seized was admissible.

## 3. CrR 8.3 Motion to Dismiss Based on Lack of Notice

In his CrR 8.3 motion, Threatts sought to dismiss count one—the UPFA charge—arguing that he never received the required notice under RCW 9.41.047(1)(a) of the firearms prohibition. Threatts testified at the hearing that he was unaware that he had been previously convicted of a felony—he thought he had been convicted of a gross misdemeanor. The trial court disagreed and denied the motion.

## B. READINESS HEARING

From the arraignment on August 3, 2015, until trial began on July 9, 2018, Threatts had five different attorneys. Threatts indicated to the trial court that communication with his first three attorneys broke down, and he believed that his third attorney was not sufficiently communicating with him. Threatts' fourth attorney moved to withdraw because he felt that he was unable to communicate with Threatts effectively about Threatts' case. Threatts' final attorney, David Kurtz, was appointed on June 7, 2018. Later, at sentencing, Threatts informed the court that he had been unable to communicate with Kurtz until the readiness hearing on July 5, 2018.

## C. TRIAL

The two-day trial began on July 9, 2018. During the first day of the trial, one of the jurors informed the court that he believed he had previously met and spoken with Corporal Pardue at a barbeque. Both parties asked the juror questions, and the juror indicated that he spoke with Corporal Pardue at a barbeque years ago for about ten minutes. Corporal Pardue had told the juror "he was police or had been prior military." VRP (July 9, 2018) at 426. When questioned, the juror indicated that he could still be fair and impartial despite that prior contact with Corporal Pardue. After the juror left the courtroom, the State informed the court that Corporal Pardue has a twin

brother who was in the military, but the court and both parties determined that no further questioning was necessary.

Nelson, Corporal Pardue, Officer Chamblee, Detective Dennis Devlin (who wrote the affidavit for the search warrant), and Nancy Druckenmiller (the fingerprint identification specialist) testified for the State. Threatts did not present any witnesses, and he chose not to testify. The jury returned a guilty verdict for all three charges.

D. SENTENCING-REQUEST TO REPRESENT HIMSELF PRO SE

The sentencing hearing was on July 27, 2018. Threatts expressed discontent with his trial counsel, Kurtz, and asked to represent himself pro se. Threatts informed the court that he had been unable to communicate with Kurtz until the readiness hearing on July 5, 2018. Threatts also informed the court that he smelled alcohol on Kurtz's breath. The court engaged in the following discussion with Threatts:

> [Threatts]: Your Honor I was –
> Judge: You – you decline? Do you want me to discharge him?
> [Threatts]: [Y]eah. I need him – I need him discharged as my attorney.
> Judge: Okay. And before sentencing?
> [Threatts]: Because how am I – how am I gonna reach you if – if I make the bail? Where am I gonna find him at?
> Judge: Okay. Mr. Kurtz you're discharged.

VRP (July 27, 2018) at 533. Later in the hearing, the court engaged in the following discussion with Threatts:

> Judge: [D]o you want me to send you to prison for the high end of the range or the low end of the range?
> [Threatts]: I need as low as possible. I want to get back to my son – I want to –
> Judge: Okay. So you know there's a sentencing range, right?

> [Threatts]: [W]e – I know – I understand there's a sentencing guideline[].
>
> Judge: Okay. And you know that the range is fifteen to twenty on Count I –
>
> [Threatts]: Right.
>
> Judge: – months –
>
> [Threatts]: Right.
>
> Judge: – and twelve to fourteen on Count II.
>
> [Threatts]: Yeah. But you can do what you want to do.
>
> Judge: Well – you can appeal it too.
>
> [Threatts]: Yeah.

VRP (July 27, 2018) at 540-41. The court sentenced Threatts to 15 months confinement on count one and 13 months confinement on count two, for a total time in confinement of 28 months. The court also imposed legal financial obligations (LFOs), including a $100 DNA collection fee and a $200 criminal filing fee.

Two months later, the State requested a hearing to ensure that Threatts had properly waived his right to counsel. The State expressed concern that a proper colloquy had not been done at the sentencing hearing. The court engaged in another discussion with Threatts:

> Judge: So just to – just to end this so you can get out of here –
>
> [Threatts]: – yes.
>
> Judge: – at the time you were sentenced you chose to represent yourself?
>
> [Threatts]: Yes.
>
> Judge: Is that accurate?
>
> [Threatts]: Yes. I did.
>
> Judge: Very good.

VRP (Oct. 23, 2018) at 550.

Threatts appeals his judgment and sentence.

ANALYSIS

I. CrR 3.5 MOTION TO SUPPRESS STATEMENTS

Threatts argues that the trial court erred by denying his CrR 3.5 motion to suppress because the police officers failed to advise him of his *Miranda* rights, he was effectively seized by the police officers outside his apartment, and his statements were involuntary. We hold that because there was sufficient evidence to support the trial court's findings of fact and the findings support the conclusions of law, Threatts' statements were admissible, and therefore, the trial court did not err by denying Threatts' CrR 3.5 motion to suppress.

CrR 3.5 establishes a pretrial process for admitting a defendant's statements at trial. While the rule broadly states that it governs the admission of "a statement of the accused," the rule actually applies only to custodial statements to law enforcement. CrR 3.5; *State v. McFarland*, 15 Wn. App. 220, 222, 548 P.2d 569 (1976). CrR 3.5 exists to implement the constitutional right to a voluntariness hearing for custodial statements. *State v. Williams*, 137 Wn.2d 746, 750-51, 975 P.2d 963 (1999).

We treat uncontested findings of fact from a CrR 3.5 hearing as verities on appeal, and if challenged, examine whether the findings of fact are supported by substantial evidence. *State v. Piatnitsky*, 170 Wn. App. 195, 221, 282 P.3d 1184 (2012). Substantial evidence exists if the evidence is sufficient to persuade a fair-minded rational person of the truth of the finding. *Piatnitsky*, 170 Wn. App. at 221. Whether the findings of fact support the trial court's legal conclusions is a question of law that we review de novo. *Piatnitsky*, 170 Wn. App. at 221-22.

To determine whether a person is in police custody, we use an objective test to ask "whether a reasonable person in a suspect's position would have felt that his or her freedom was curtailed

to the degree associated with a formal arrest." *State v. Heritage*, 152 Wn.2d 210, 218, 95 P.3d 345 (2004). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (footnote omitted).

There have been cases similar to this one where we held that a defendant was not in custody either in their home or in a hotel room. *See State v. Rosas-Miranda*, 176 Wn. App. 773, 309 P.3d 728 (2013); *State v. Smith*, 154 Wn. App. 695, 226 P.3d 195 (2010). In *Rosas-Miranda*, we held that the defendant was not in custody. There, eight or nine police officers were inside of the defendant's apartment. 176 Wn. App. at 776. One officer, who spoke Spanish (which the defendant spoke), stayed within earshot of the defendant and the other adult resident. 176 Wn. App. at 776-77. That officer did not restrict their movement or tell them that he was monitoring them, and told the defendant that the warrantless search was voluntary and that she could withdraw consent to the search at any time. 176 Wn. App. at 775-77, 786. In *Smith*, we held that the defendant was not required to leave his hotel room, and he was never instructed that he had to wait in a particular area, when the officers briefly searched the room; therefore, we held that the defendant was never seized. 154 Wn. App. at 698, 702.

A. CUSTODIAL INTERROGATION

Here, the police officers knocked on Threatts' door late at night. Threatts voluntarily left his apartment to stand on the landing of the apartment to speak with the officers. Threatts was never in handcuffs, and he spoke to the officers willingly throughout the conversation. The officers

never drew their weapons. The officers told Threatts that he could not go back into his apartment, but repeatedly advised him that he was free to leave and offered to retrieve his son from the apartment. Threatts declined the officers' offers to retrieve his son, but he did ask them to retrieve shorts for him. Threatts made the incriminating statement spontaneously and not in response to any questions by the officers. The only question the officers asked Threatts after he made his statement and before the officers read him his *Miranda* rights was a clarifying question regarding his incriminating statement.

There was substantial evidence to support the trial court's findings of fact that Threatts was not in police custody and that he spoke to the police officers voluntarily before and after being advised of his *Miranda* rights, and the findings support the conclusions of law that Threatts' statement was properly admissible. Further, Threatts was never interrogated because the police officers did not say anything or behave in any manner which was likely to illicit Threatts' incriminating response. *Rhode Island*, 446 U.S. at 301. Threatts made the incriminating statement—that they would find the gun inside his apartment—without any questioning by the police officers.

Therefore, we hold that Threatts was not in custody until his *Miranda* rights were read to him, he was not interrogated when he made the incriminating statement, and the police officers were not required to read Threatts his *Miranda* rights when he made the incriminating statement.

B. THREATS OR COERCION

Threatts also argues that Corporal Pardue tricked him by initially identifying himself as "Bill" after knocking on the apartment door. We disagree.

Police deception alone does not make a defendant's statements inadmissible. *See State v. Braun*, 82 Wn.2d 157, 161, 509 P.2d 742 (1973). In *Braun*, our Supreme Court held that even though the police had deceived the defendant, the statements that the defendant made were not involuntary because there were no threats, coercion, or cajolery. *Braun*, 82 Wn.2d at 162-63.

Corporal Pardue and Officer Chamblee were in their police uniforms, making it clear they were on-duty law enforcement at the time they approached Threatts' apartment door. Threatts chose to exit his apartment once he saw that he was speaking to law enforcement. The officers advised Threatts numerous times that he was free to leave, and he chose to remain talking to the officers outside on the landing.

Because the officers were in uniform and made no threats or promises to Threatts in exchange for speaking with them, there was substantial evidence to support the trial court's finding of fact that Threatts was not threatened or coerced by the officers, and the findings support the conclusion of law that Threatts' statements were voluntary. Thus, we hold that because Threatts' statements were voluntarily made to the police officers, the statements were admissible, and thus, the trial court did not err by denying his CrR 3.5 motion to suppress.

## II. CrR 3.6 Motion to Suppress Evidence

Threatts argues that the trial court erred by denying his motion to suppress evidence because the search warrant was invalid, there was no probable cause, and the search warrant was based on improper police conduct. We hold that because Threatts' statements were properly admissible, and probable cause existed for the search warrant, the trial court did not err by denying Threatts' CrR 3.6 motion to suppress the evidence.

Under both the federal and state constitutions,[3, 4] a search warrant may issue only upon a determination of probable cause. *State v. Friedrich*, 4 Wn. App. 2d 945, 954, 425 P.3d 518 (2018), *review denied*, 192 Wn.2d 1012 (2019). "Probable cause is established when an affidavit supporting a search warrant provides sufficient facts for a reasonable person to conclude there is a probability the defendant is involved in the criminal activity and that evidence of the crime is at a certain location." *Friedrich*, 4 Wn. App. at 954. We must not view the affidavit "'in a hypertechincal manner,'" and "'[d]oubts concerning the existence of probable cause are generally resolved in favor of issuing the search warrant.'" *Friedrich*, 4 Wn. App. 2d at 955 (quoting *State v. Riley*, 34 Wn. App. 529, 531, 663 P.2d 145 (1983); *State v. Vickers*, 148 Wn.2d 91, 108-09, 59 P.3d 58 (2002)).

As discussed above, Threatts' statements to the police officers were lawfully obtained, and thus, were properly admissible. Threatts' statements also supported the affidavit for the search warrant. We hold that there was probable cause for the search warrant.

### III. FIREARMS PROHIBITION NOTICE

Threatts argues that he was not previously advised of the firearms prohibition as required under RCW 9.41.047(1)(a). Thus, he argues that the trial court erred by denying his CrR 8.3

---

[3] The Fourth Amendment states,

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[4] Article 1, section 7 of the Washington State Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

motion to dismiss the UPFA charge. We hold that there was sufficient evidence that Threatts had actual notice of the firearms prohibition in 1996 as required by RCW 9.41.047(1)(a), and the findings are supported by substantial evidence. Accordingly, the trial court did not err by denying his CrR 8.3 motion to dismiss.

Under CrR 8.3(c), the defendant "may, prior to trial, move to dismiss a criminal charge due to insufficient evidence establishing a prima facie case of the crime charged." The motion must be in writing, supported by an affidavit or declaration alleging no material disputed facts, and may include relevant attachments. CrR 8.3(c)(1). The trial court "shall grant the motion if there are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt." CrR 8.3(c)(3). The trial court views all the evidence and must make all reasonable inferences in the light most favorable to the State. CrR 8.3(c)(3).

The firearms probation notice requirement of RCW 9.41.047(1)(a) provides:

> At the time a person is convicted . . . the convicting or committing court . . . shall notify the person, orally and in writing, that the person must immediately surrender any concealed pistol license and that the person may not possess a firearm unless his or her right to do so is restored by a court of record.

In *State v. Minor*, 162 Wn.2d 796, 174 P.3d 1162 (2008), our Supreme Court reversed the defendant's conviction for UPFA because the trial court in the underlying predicate conviction failed to comply with the firearms prohibition notice as required by RCW 9.94A.047(1). "'The only remedy appropriate for the statutory violation is to reverse the current conviction.'" *State v. Garcia*, 191 Wn.2d 96, 101, 420 P.3d 1077 (2018) (quoting *Minor*, 162 Wn.2d at 804).

In *State v. Breitung*, 173 Wn.2d 393, 402, 267 P.3d 1012 (2011), our Supreme Court determined what constitutes a violation of RCW 9.41.047(1):

> [W]here a convicting court has failed to give the mandatory notice directed in RCW 9.41.047(1) and there is no evidence that the defendant has *otherwise acquired actual knowledge of the firearm possession prohibition that RCW 9.41.047(1) is designed to impart*, the defendant's subsequent conviction for unlawful possession of a firearm is invalid and must be reversed.

(Emphasis added.) The court has also held that "information that is communicated by or derived from an authorized source, such as a judge, a probation officer, a member of the court staff, or defense counsel, even though later acquired, will meet the requirement of the statute." *Garcia*, 191 Wn.2d at 105.

Here, Threatts filed a CrR 8.3 motion to dismiss, arguing that the court did not notify him of the firearms prohibition in 1996 when he was sentenced for second degree assault. The 1996 judgment and sentence indicated that Threatts was present in court when he was sentenced. The judgment and sentence contained a paragraph notifying Threatts that he could no longer own or possess firearms. There was no line for Threatts to sign the judgment and sentence, but his counsel signed it, and Threatts' fingerprints are on the document.

Threatts also entered a guilty plea for second degree theft in 1997; the plea agreement for that charge includes a paragraph stating Threatts acknowledged that he could no longer own or possess firearms. Threatts signed this plea agreement. At the CrR 8.3 hearing, Threatts presented no evidence to the trial court that he was affirmatively misled by any court personnel or judicial officer.

The trial court's findings are supported by substantial evidence, and they support the court's conclusions of law that Threatts had been previously notified of the firearms prohibition.

Therefore, because Threatts was notified of the firearms prohibition in 1996 and in 1997, we hold that the trial court did not err by denying his CrR 8.3(c) motion to dismiss.

IV.  INEFFECTIVE ASSISTANCE OF COUNSEL

Threatts argues that he received ineffective assistance of counsel because his counsel, Kurtz, failed to communicate with him about the investigation and trial preparation, and Kurtz failed to inquire about prior contact between a juror and Corporal Pardue.  We hold that Threatts did not receive ineffective assistance of counsel.

A claim that counsel was ineffective is a mixed question of law and fact that we review de novo.  *State v. Jones*, 183 Wn.2d 327, 338, 352 P.3d 776 (2015).  The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).

In *Strickland*, the United States Supreme Court set forth a two-prong inquiry for reversal of a criminal conviction based on ineffective assistance of counsel.  *Strickland*, 466 U.S. at 687.  Under the *Strickland* test, the defendant bears the burden to show (1) counsel's performance was deficient and (2) the attorney's deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  In other words, "but for counsel's deficient performance, the outcome of the proceedings would have been different."  *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).  Failure to make the required showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim.  *Strickland*, 466 U.S. at 700.

We review de novo whether counsel's performance was deficient.  *See Jones*, 183 Wn.2d at 338.  Representation is deficient if it falls "below an objective standard of reasonableness,"

given all of the circumstances. *Strickland*, 466 U.S. at 688. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time. *Strickland*, 466 U.S. at 689. There is a strong presumption that counsel's performance was reasonable. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011).

Because there is a strong presumption that counsel is effective, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Counsel's conduct is not deficient if it can be characterized as a legitimate trial strategy, but the relevant question is not whether counsel's choices were strategic, but whether they were reasonable. *Grier*, 171 Wn.2d at 33-34. However, when the record does not show what counsel's reasons were for making a particular choice at trial, we may not determine that the decision *was* strategic. *State v. Linville*, 191 Wn.2d 513, 525-26, 423 P.3d 842 (2018). "[W]hen 'the claim is brought on direct appeal, the reviewing court will not consider matters outside the trial record.'" *Linville*, 191 Wn.2d at 525 (quoting *McFarland*, 127 Wn.2d at 335).

A. INVESTIGATION AND PRE-TRIAL

Threatts first argues that Kurtz's performance was deficient because he failed to communicate with Threatts as to his investigation of the case and pre-trial issues. We disagree.

Threatts' fifth trial counsel, Kurtz, was appointed to represent him on June 7, 2018. Threatts indicated to the trial court that despite numerous efforts, he was unable to meet with Kurtz until the readiness hearing on July 5. Threatts' main argument seems to be that Kurtz did not call any of the witnesses Threatts requested. However, we cannot tell from this record why Kurtz

chose not to call any witnesses. And therefore, because the record does not contain any evidence of the reasons for Kurtz's decision not to call the witnesses Threatts requested, we cannot determine whether that decision constituted ineffective assistance of counsel. *Linville*, 191 Wn.2d at 525.

At the readiness hearing, Kurtz informed the trial court that he was ready for trial and that he would not be presenting any witnesses. Kurtz was appointed almost one month before trial. Threatts' prior attorneys adequately prepared the case by arguing motions, filing necessary continuances, and engaging in other pretrial practices. There is no evidence in the record that the prior four attorneys were deficient or that Kurtz was unprepared for trial even though he did not speak with Threatts until the readiness hearing.

At trial, Kurtz made proper objections, thoroughly cross-examined witnesses, and made arguments to the jury regarding his theory of the case. One month may be sufficient time for an attorney to prepare for trial, particularly when four other defense attorneys had been preparing the case for the previous three years.

The record does not show that Kurtz was not adequately prepared for trial. And there is nothing in the record to show why he did not meet with Threatts until the readiness hearing or why he chose not to call witnesses. Thus, we cannot determine on this record that counsel was deficient, and Threatts fails to show otherwise.

B. JUROR

Threatts next argues that Kurtz's performance was deficient because he failed to adequately question the juror who informed the trial court that he had previously met and spoke with Corporal Pardue. Again, we disagree.

After being apprised that a juror had prior contact with one of the witnesses, the court brought the juror in for further questioning. The court, the State, and Kurtz asked the juror questions regarding his prior encounter with Corporal Pardue. The juror indicated that Corporal Pardue had "mentioned he was police or had been prior military." VRP (July 8, 2018) at 426. Kurtz asked whether Corporal Pardue had discussed with him "any law enforcement stuff," to which the juror replied, "No." VRP (July 8, 2018) at 427. Both the State and Kurtz asked the juror whether he could be fair and impartial given this prior contact, and the juror indicated that he could.

Again, the record demonstrates that Kurtz questioned the juror after the State and was satisfied that the juror could be fair and impartial given the juror's brief prior contact with Corporal Pardue. Thus, because we can conceive of a legitimate trial tactic for counsel not striking this juror, we hold Threatts fails to show that counsel was deficient. *See Linville*, 191 Wn.2d at 525.[5]

## V. PRO SE REPRESENTATION AT SENTENCING

Threatts argues that the trial court erred by allowing him to represent himself pro se at the sentencing hearing. Threatts argues that the court "failed to show a valid knowing, voluntary, and intelligent waiver" of his right to counsel, and thus, a remand for resentencing is required. Br. of Appellant at 39-45. We agree.

Article 1, section 22 of the Washington Constitution and the Sixth Amendment to the United States Constitution guarantee a criminal defendant the right to assistance of counsel. A criminal defendant also has the right to self-representation under the same provisions. *State v.*

---

[5] Because we hold that Threatts has failed to show that Kurtz's performance was deficient, we do not reach Threatts' prejudice argument.

*Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). The right of self-representation is "so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." *Madsen*, 168 Wn.2d at 503.

However, a tension exists between the rights of self-representation and to counsel. *State v. Curry*, 191 Wn.2d 475, 482, 423 P.3d 179 (2018). By requesting to represent himself, a defendant waives his right to counsel. *Curry*, 191 Wn.2d at 482-83. But criminal defendants do not have an absolute right to self-representation. *Curry*, 191 Wn.2d at 482. A trial court may allow a defendant to represent himself only if the defendant waives his right to counsel voluntarily, knowingly, and intelligently. *Curry*, 191 Wn.2d at 483. "If counsel is properly waived, a criminal defendant has a right to self-representation." *City of Bellevue v. Acrey*, 103 Wn.2d 203, 209, 691 P.2d 957 (1984).

The preferred method for determining whether a waiver is valid is for the court to conduct a thorough colloquy with the defendant to determine whether the defendant's waiver of his right to counsel is knowing, intelligent, and voluntary. *State v. Howard*, 1 Wn. App. 2d 420, 425, 405 P.3d 1039 (2017). The trial court must indulge every reasonable presumption against waiver of the right to counsel. *Madsen*, 168 Wn.2d at 504. The trial court may deny a request for self-representation if the request is "made without a general understanding of the consequences." *Madsen*, 168 Wn.2d at 505.

For the trial court's colloquy to be sufficient, we strictly adhered to certain requirements:

> "Th[e] colloquy, *at a minimum*, should consist of informing the defendant of the nature and classification of the charge, *the maximum penalty upon conviction* and that technical rules exist which will bind the defendant in the presentation of his case."

*Howard*, 1 Wn. App. 2d at 426 (quoting *Acrey*, 103 Wn.2d at 211). If the trial court does not address those issues in its colloquy, the record must otherwise show that the defendant was properly informed. *Howard*, 1 Wn. App. 2d at 428.

We review for an abuse of discretion a trial court's decision on whether a defendant's waiver of the right to counsel is voluntary, knowing, and intelligent. *In re Pers. Restraint Petition of Rhome*, 172 Wn.2d 654, 667, 260 P.3d 874 (2001). A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or applies an erroneous view of the law. *Rhome*, 172 Wn.2d at 668. It is the defendant's burden to show that the waiver of the right to counsel was not knowing and intelligent. *Howard*, 1 Wn. App. 2d at 426. "Because the right to counsel is so fundamental, a trial court's erroneous finding that the defendant validly waived the right to counsel cannot be treated as harmless error." *Howard*, 1 Wn. App. 2d at 426.

Here, at sentencing, Threatts expressed discontent with Kurtz and asked to represent himself pro se. Threatts informed the court that he had a difficult time reaching Kurtz from the day Kurtz was appointed on June 7, 2018, until the readiness hearing on July 5, and he believed Kurtz smelled of alcohol the day of trial. The court then engaged in a short discussion with Threatts. VRP (July 27, 2018) at 533. Threatts was never informed of the nature and seriousness of the charges, the maximum penalty for the crimes he was convicted of, or the risks Threatts faced with representing himself pro se at sentencing.

In fact, the State requested a hearing in October of that year to ensure that Threatts had knowingly, intelligently, and voluntarily waived his right to counsel. The State expressed concern that a proper colloquy had not been done at the sentencing hearing. VRP (Oct. 23, 2018) at 548.

The trial court's colloquy failed to ensure that Threatts' waiver was knowing, intelligent, and voluntary, and the court abused its discretion by accepting his waiver. We remand to the trial court for resentencing and order the court to appoint counsel to represent Threatts, and after consultation with counsel, Threatts may withdraw his request for resentencing.

## VI. LFOs

Threatts argues that the trial court erred by imposing the $100 DNA collection fee and the $200 criminal filing fee. The State concedes that the trial court erred. We accept the State's concession and hold that the trial court erred by failing to conduct a proper inquiry into whether Threatts has previously provided his DNA and whether he is indigent. On remand, the trial court shall conduct a proper inquiry into whether Threatts has previously provided a DNA sample and whether he is indigent.

CONCLUSION

We affirm Threatts' conviction, but we remand to the trial court for resentencing. The court must appoint counsel to represent Threatts and, after consultation with counsel, Threatts may withdraw his request for the court to impose a new sentence. Either way, on remand, the court must conduct an adequate individualized inquiry into whether Threatts has previously provided a DNA sample and whether he is indigent.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Sutton, A.C.J._

SUTTON, A.C.J.

We concur:

_Maxa, J._

MAXA, J.

_Glasgow, J._

GLASGOW, J.